# Exhibit 6

~~Eamonn Gardner~~Amy H. Candido (CA SBN ~~310834~~237829)
~~COOLEY LLP~~
~~1144 15th Street, Suite 2300~~
~~Denver, CO 80202~~
~~Phone: (720) 566-4000~~
~~Fax: (720) 566-4099~~
~~egardner@cooley~~amy.candido@stblaw.com
~~Alexandra Mayhugh~~Jeff Nardinelli (CA SBN ~~300446~~295932)
jeff.nardinelli@stblaw.com
~~COOLEY~~**SIMPSON THACHER & BARTLETT** LLP
One Market Plaza
~~355 South Grand Avenue~~Spear Tower, Suite ~~900~~3800
~~Los Angeles~~San Francisco, CA ~~90071~~94105
Phone: (~~213~~415) ~~561-3250~~426-7300
Fax: (~~213~~415) ~~561-3244~~426-7301
~~amayhugh@cooley.com~~

~~Megan~~Sanford L. ~~Donohue~~Michelman (CA SBN ~~266147~~179702)
~~Vivienne A. Goldschlag (CA SBN 345611)~~
smichelman@mrllp.com
~~COOLEY~~**MICHELMAN & ROBINSON,** LLP
~~10265 Science Center Drive~~
10880 Wilshire Blvd., 19th Floor
~~San Diego~~Los Angeles, CA ~~92121~~90024
Phone: (~~858~~310) ~~550-6000~~299-5500
Fax: (~~858~~310) ~~550-6420~~299-5600
~~mdonohue@cooley.com~~
~~vgoldschlag@cooley.com~~

*Counsel for Defendants Orion Longevity Inc.*
*and Blue Fuzion Group Ltd.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

|  |  |
|---|---|
| EIGHT SLEEP INC.,<br><br>              Plaintiff,<br><br>      v. | Case No. 2:~~25~~26-cv-~~09685-SB-RAO~~-02460-SB-KS<br><br>~~**ORION LONGEVITY INC. AND BLUE FUZION GROUP**~~ |

|  |  |
|---|---|
| ORION LONGEVITY INC., and BLUE FUZION GROUP LTD.<br><br>Defendants. | ~~LTD.'S~~**DEFENDANTS' FIRST AMENDED** **INVALIDITY CONTENTS**<br><br>Hon. Stanley Blumenfeld, Jr.<br>Courtroom: 6C |

Defendants Orion Longevity Inc. ("Orion") and Blue Fuzion Group Ltd. ("BFG") (collectively "Defendants") hereby submit~~s~~ the following Invalidity Contentions to Plaintiff Eight Sleep Inc. ("Plaintiff" or "Eight Sleep") regarding ~~claims 1, 3, 9, 11, 12, 14, 18, 19 and 20 of U.S. Patent No. 10,792,461 (the "'461 Patent");~~ claims 1, 2, 3, 5, 6, 8-12, 15, and 29 of U.S. Patent No. 12,377,240 (the "'240 Patent"); and claims 1, 2, 3, 4, 5, 9, 10, 11, 22, 23, 28, and 29 of the U.S. Patent No. 12,370,339 (the "'339 Patent") (collectively, the "Asserted Claims" of the "Asserted Patents").

Defendants submit these Invalidity Contentions in response to Plaintiff's January 16, 2026, Infringement Contentions and reserve all rights to amend, modify, and/or supplement the Invalidity Contentions if Plaintiff deviates from its Initial Infringement Contentions, including by adding to the currently unasserted claims, changing theories, or the like. Defendants continue to dispute that this Court has jurisdiction and preserve all arguments and objections raised in its pending motion to dismiss, including that Plaintiff has failed to establish subject matter or personal jurisdiction and any objection to an obligation to provide these invalidity contentions. Defendants further preserve all arguments and objections that Plaintiff has failed to adequately plead its false advertising and UCL claims. Any contentions are served without waiver of those arguments or objections.

As set forth herein, each and every claim asserted by Eight Sleep in this action is invalid on multiple grounds. Extensive prior art was known in the field prior to the earliest effective priority dates of the asserted patents and claims. Moreover, to the extent Eight Sleep contends that its claims are distinguishable from the prior art based on purportedly narrow points of distinction, any such alleged distinctions further undermine any claim of infringement liability asserted against Defendants. Nothing in the asserted claims reflects any fundamental advance over the prior art, and any alleged incremental differences would have been obvious to a person of ordinary skill in the art and therefore do not support meritorious infringement claims against Defendants.

Discovery is ongoing, and Defendants reserve the right to supplement or modify these Invalidity Contentions as permitted under the Local Rules, the Federal Rules of Civil Procedure, and the Court's Orders. Defendants further reserve the right to supplement or amend these disclosures and any associated document production based on further investigation, analysis, and discovery, including information obtained through third-party discovery, consultation with experts and other third parties, and developments relating to claim construction, priority dates, or other issues addressed by the Court. Defendants also reserve the right to amend these Invalidity Contentions and/or modify their selection of prior art references should Eight Sleep be permitted to serve supplemental or amended infringement contentions.

The following contentions are based on Defendants' current understanding of the asserted claims as applied in Eight Sleep's Infringement Contentions, without the benefit of completed claim construction. Defendants will provide their claim construction positions at the appropriate time pursuant to the governing scheduling order. Accordingly, these Invalidity Contentions may reflect alternative and conditional positions regarding claim scope and construction. To the extent these

contentions reference or imply any particular interpretation of a claim term or limitation, Defendants do not adopt or concede any such construction and expressly reserve the right to contest claim scope and meaning.

These Invalidity Contentions do not constitute any admission by Defendants that any accused product or system, whether current or prior versions, practices any asserted claim. Defendants take no position herein regarding the proper construction or scope of the asserted claims. To the extent prior art cited for a given limitation discloses functionality or characteristics that may be similar in certain respects to features alleged by Eight Sleep to exist in the accused products, Defendants do not concede that any such claim limitation is met.

Because Defendants are continuing their analysis of relevant prior art, Defendants reserve the right to further revise, amend, and/or supplement the information provided herein, including identifying, charting, and/or relying upon additional prior art references, relevant disclosures, and bases for Invalidity Contentions. Additional prior art, disclosures, and invalidity defects, whether cited in this disclosure and whether known to Defendants, may become relevant as investigation, analysis, and discovery continue. Additionally, Defendants reserve the right to present additional prior art references and/or disclosures under pre-AIA 35 U.S.C. §§ 102(a), (b), (e), (f), and/or (g), and/or § 103, or AIA 35 U.S.C. § 102 and/or § 103, located during the course of such discovery or further investigation, and to assert invalidity under pre-AIA 35 U.S.C. §§ 102(c), (d), or (f), or AIA 35 U.S.C. § 102, to the extent that such discovery or investigation yields information forming the basis for such invalidity.

Furthermore, to the extent Plaintiff asserts the doctrine of equivalents, a "doctrine of equivalents theory cannot be asserted if it will encompass or 'ensnare' the prior art." *Jang v. Bos. Sci. Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017) (citation omitted). To the extent Plaintiff asserts the doctrine of equivalents for any of the

claimed limitations, they would ensnare the prior art for the reasons and based on the evidence discussed below and in the accompanying charts. Defendants reserve the right to use these disclosures as well as further discovery and disclosures for purposes of noninfringement.

The Asserted Claims are governed under the Leahy-Smith America Invents Act ("AIA"). According to the Manual of Patent Examining Procedure ("MPEP") § 2159, "[i]f there is ever even a single claim to a claimed invention in the application having an effective filing date on or after March 16, 2013, AIA 35 U.S.C. §§ 102 and 103 apply in determining the patentability of every claimed invention in the application. This is the situation even if the remaining claimed inventions all have an effective filing date before March 16, 2013, and even if the claim to a claimed invention having an effective filing date on or after March 16, 2013, is canceled." MPEP § 2159.02. However, Defendants' analysis applies equally under pre-AIA law.

## I.   THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. §§ 102 AND 103[1]

### A.   The Asserted Claims of the '461240 Patent

The application leading to issuance of the '461 Patent was filed on June 28, 2019. The '461 Patent is part of a series of continuations beginning with US 14/732,624, filed on June 5, 2015. The '461 Patent purportedly claims priority to provisional application US 62/008,480, filed on June 5, 2014.

During prosecution, all claims were rejected in a Non-Final Rejection issued on August 7, 2019 under a 35 U.S.C. § 103 obviousness rejection in light of two patent applications, US 2007/0179334 A1 and US 2012/0119886 A1. On November 4, 2019, Applicant canceled claims 18-20, amended claims 1 and 16, and added claims 21-23.

---

[1] While references throughout to 35 U.S.C. §§ 101 et al. refer to AIA versions of those statutes, Defendants' analysis applies equally under pre-AIA versions of the statutes.

DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

The '461 application was rejected again in a Final Rejection issued on December 4, 2019 under a new § 103 obviousness rejection. Applicant once again amended claims 1 and 23, cancelled claim 22, and added claim 24 which claimed identifying a user based on their biological signal data, not merely presence. The applicant once more amended claims 1 and 23, cancelled claim 24, and added claim 24 on June 3, 2020 to specify the sensor location which identify users. Following an amendment for clarity of claim 15 on August 5, 2020, the '461 patent issued on September 19, 2020.

### ~~B.    The Asserted Claims of the '240 Patent~~

The application leading to issuance of the '240 Patent was filed on January 15, 2025. The '240 Patent is part of a series of continuations beginning with US 14/732,624, filed on June 5, 2015. The '240 Patent purportedly claims priority to provisional application US 62/008,480, filed on June 5, 2014.

During prosecution, all claims were rejected in a Non-Final Rejection issued on March 3, 2025 for double patenting in light of Application No. 19/022,417 and 35 U.S.C. § 103 obviousness rejection in light of US 2012/0119886 A1 and US 2011/0115635 A1. Applicant amended claims 1, 10, and 12, added claim 31, and cancelled claim 11 on May 15, 2025. The amendments specifically defined multiple users with a first and second instruction based on user-specified preferences. Applicant subsequently filed a terminal disclaimer on May 23, 2025 in response to the double patenting rejection. The '240 patent issued without further amendments or rejections on July 23, 2025.

### ~~C~~**B.**    The Asserted Claims of the '339 Patent

The application leading to issuance of the '339 Patent was filed on January 15, 2025. The '339 Patent is part of a series of continuations beginning with US 14/732,624, filed on June 5, 2015. The '~~461~~**339** Patent purportedly claims priority to provisional application US 62/008,480, filed on June 5, 2014.

During prosecution, all claims were rejected in a Non-Final Rejection issued on March 11, 2025 for double patenting in light of Application No. 19/022,417, and

claims 1-16, 23, and 26-30 were rejected under a 35 U.S.C. § 103 obviousness rejection in light of US 2012/0119886 A1 and US 2011/0115635 A1. Applicant amended claims 1, 4, and 28, added claim 31, and cancelled claim 5 on May 15, 2025. The amendments taught the combination of steps to modify a temperature based on a specific sequence of biological signals. Applicant filed a terminal disclaimer on May 23, 2025 to overcome the double patenting rejection. The '339 patent issued without further amendments or rejections on July 15, 2025.

## ~~D~~C.   Identity of Each Item of Prior Art

Subject to Defendants' reservation of rights, Defendants identify each item of prior art that anticipates or renders obvious one or more of the Asserted Claims in the attached Prior Art Index submitted herewith. (*See* Appendix A, *infra*.) To the extent that the references listed in Appendix A are not identified as items of prior art that anticipate and/or render obvious an Asserted Claim, Defendants intend to rely on these references as background, as evidence of the state of the art at the time of Plaintiff's alleged invention, as demonstrating inherency in the prior art, for motivations to combine and/or reasonable expectations of success, or for any other purpose related to its invalidity defenses. Defendants identify that prior art references that Defendants intend to rely on for the above-stated purposes further include materials that either have been (1) identified in these Invalidity Contentions (though not necessarily in Appendix A) but not produced (e.g., cited on the face of the Asserted Patents); (2) produced and identified in these Invalidity Contentions (e.g., by BATES range) but not in Appendix A; or (3) produced but not specifically identified in these Invalidity Contentions.

Additionally, several of the prior art references are related patent applications and issued patents that contain substantially the same subject matter (e.g., published U.S. patent applications, and issued U.S. Patents, foreign applications and issued patents). Any citation to or quotation from any of these patent applications or

patents, therefore, should be understood as encompassing any parallel citation to the same subject matter in other related applications or patents. Defendants also reserve the right to later rely upon all references or portions of references provided in Appendix A to supplement or amend its disclosures contained herein. Also, to the extent not expressly mentioned herein, Defendants incorporate by reference: (1) any and all prior art contained or identified in documents produced thus far by Plaintiff to Defendants in this case, including references cited in or on the face of the Asserted Patents; and (2) any and all additional materials regarding invalidity that should have been produced to Defendants but have not been produced to date, to the extent that any exist.

Each disclosed item of prior art is evidence of a prior invention by another under 35 U.S.C. § 102(g), as evidenced by the named inventors, authors, organizations, and publishers involved with each such reference. Defendants further intend to rely on admissions of the named inventors concerning the prior art,including statements found in the Asserted Patents, their prosecution histories, related patents and/or patent applications, any testimony, and the papers filed and evidence submitted by Plaintiff in conjunction with this litigation.

**E~~D~~. Whether Prior Art Anticipates or Renders Obvious the Asserted Claims**

Subject to Defendants' reservation of rights, Defendants identifies in the attached Exhibits A-1 through A-9, B-1 through B-6, and C-1 through C-9, identified in Appendix B ("Prior Art Invalidity Charts") prior art references that anticipate the Asserted Claims under at least pre-AIA 35 U.S.C. §§ 102(a), (b), (e), and/or (g), or AIA 35 U.S.C. § 102, either expressly or inherently, and/or render obvious the Asserted Claims under 35 U.S.C. § 103 either alone or in combination with other references cited therein. Each Asserted Claim is anticipated by, and/or obvious in view of, one or more items of prior art identified in these disclosures,

alone or in combination. Tables identifying prior art references that anticipate the claims, and the combinations of references that render obvious the claims, are provided in Section G below.

Much of the art identified in the attached Prior Art Invalidity Charts reflects common knowledge and the state of the art at the time of alleged priority date of the Asserted Patents. Defendants may rely on additional citations, references, expert testimony, and other material to provide context or to aid in understanding the cited portions of the references and/or cited features of the systems. Defendants may also rely on expert testimony explaining relevant portions of references, relevant systems, and other discovery regarding relevant subject matter. Additionally, Defendants may rely on other portions of any prior art reference for purposes of explaining the background and general technical subject area of the reference.

Where an individual reference is cited with respect to all elements of an Asserted Claim, Defendants contends that the reference anticipates the claim under pre-AIA 35 U.S.C. §§ 102(a), (b), (e), and/or (g), or AIA 35 U.S.C. § 102, and also renders obvious the claim under pre-AIA and AIA 35 U.S.C. § 103, both by itself in view of the knowledge of a person of ordinary skill in the art and in combination with the other cited references to the extent the reference is not found to disclose one or more claim elements. A single prior art reference, for example, can establish obviousness where the differences between the disclosures within the reference and the claimed invention would have been obvious to one of ordinary skill in the art. For instance, "[c]ombining two embodiments disclosed adjacent to each other in a prior art patent does not require a leap of inventiveness." *Bos. Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009). To the extent Plaintiff contends that an embodiment within a particular item of prior art does not fully disclose all limitations of a claim, Defendants accordingly reserve its right to rely on other

embodiments in that prior art reference, or other information, to show single reference obviousness under pre-AIA and AIA 35 U.S.C. § 103(a).

Where an individual reference is cited with respect to fewer than all elements of an Asserted Claim, Defendants contends that the reference renders obvious the claim under pre-AIA and AIA 35 U.S.C. § 103(a) in view of each other reference and combination of references that discloses the remaining claim element(s), as indicated in the Prior Art Invalidity Claim Charts submitted herewith and the tables in Section G, and as more fully discussed below. "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). Exemplary motivations to combine references are discussed below. Defendants reserve the right to rely upon any references or assertions identified herein in connection with Defendants' contention that each Asserted Claim is invalid under 35 U.S.C. § 103 and to rely upon expert testimony addressing such references and assertions.

The fact that prior art is identified to anticipate the Asserted Claims presents no obstacle in also relying on that reference as a basis for invalidity based on obviousness. It is established that "a rejection for obviousness under § 103 can be based on a reference which happens to anticipate the claimed subject matter." *In re Meyer*, 599 F.2d 1026, 1031 (C.C.P.A. 1979). To the extent any prior art item listed in Appendix A may not fully disclose a limitation of an Asserted Claim or is alleged by Plaintiff to lack disclosure of the limitation, such limitation is present and identified in another prior art item as shown in the attached Prior Art Invalidity Claim Charts and the tables in Section G.

Many of the references cited in the Prior Art Invalidity Claim Charts cite or relate to additional references and/or products, systems, or services. Defendants may rely upon such additional references and copies or exemplars of such products or systems. Defendants will produce or make available for inspection any such cited references that it intends to rely upon. Defendants will produce or make available for inspection certified translations of any reference it intends to rely upon.[2] Defendants may also rely upon the disclosures of the references cited and/or discussed during the prosecution of the Asserted Patents and/or the assertions presented regarding those references.

Each limitation of the Asserted Claims was well-known to those of ordinary skill in the art before the alleged priority dates of the Asserted Patents, as detailed below and described in the accompanying Prior Art Invalidity Charts. As explained more fully below and throughout these Invalidity Contentions, the Asserted Claims of the Asserted Patents are anticipated and/or obvious in view of the prior art references listed in Appendix A.

### 1. Obviousness and Motivations to Combine

Each prior art reference may be combined with one or more other prior art references to render obvious the Asserted Claims in the combinations identified herein and as explained in more detail below. The disclosures of these references also may be combined with information known to persons skilled in the art at the time of the alleged invention and understood and supplemented in view of the common sense of persons skilled in the art at the time of alleged invention, including any statements in the intrinsic record of the Asserted Patents and related applications.

---

[2] Defendants produced machine translated copies of JP2009022565A ("Inoue"), JPH05329038A ("Matsunaka"), JP2014042773A ("Nemoto"), and JP2003061918A ("Sato").

A person of ordinary skill in the art would have been motivated to combine the prior art based on the nature of the problem to be solved, the teachings of the prior art, and the knowledge of persons of ordinary skill in the art. The identified prior art references, including portions cited in the Prior Art Invalidity Charts submitted herewith, address the same or similar technical issues and suggest the same or similar solutions to those issues at the Asserted Claims. On an element-by-element basis, Defendants expressly intend to combine one or more prior art items with each other to address any contentions from Eight Sleep that a particular prior art item supposedly lacks one or more elements of an Asserted Claim. In other words, Defendants contend that each charted prior art item can be combined with other charted prior art items when a particular prior art item lacks or does not explicitly disclose an element or feature of an Asserted Claim, as set forth in the Prior Art Invalidity Charts and tables in Section G. The obviousness combinations identified below are not to be construed to suggest that any reference included in the combinations is not anticipatory. Defendants will further specify the motivations to combine the prior art, including through reliance on expert testimony, at the appropriate later stage of this litigation.

A person of ordinary skill in the art would have been motivated to combine the prior art as described in the Prior Art Invalidity Charts and the tables in Section G. As the Supreme Court held in *KSR International Company v. Teleflex, Inc.*: "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." 550 U.S. at 416. The Supreme Court further held that, "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same

way, using the technique is obvious unless its actual application is beyond his or her skill." Id. at 417.

Moreover, "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." Id. at 420. It is sufficient that a combination of elements was "obvious to try" holding that, "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." Id. at 421. "In that instance the fact that a combination was obvious to try might show that it was obvious under § 103." Id. Finally, the Supreme Court recognized that "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." Id. at 419. All of the following rationales recognized in KSR support a finding of obviousness for all of the combinations identified herein:

1) Combining prior art elements according to known methods to yield predictable results;

2) Simple substitution of one known element for another to obtain predictable results;

3) Use of known techniques to improve similar devices (methods or products) in the same way;

43) Applying a known technique to a known device (method or product) ready for improvement to yield predictable results;

54) "Obvious to try"—choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

65)    Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art; and

76)    Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Certain of these rationales are discussed more specifically below. The fact that others are not discussed more specifically should not be interpreted as an admission or concession that it does not apply. To the contrary, the discussion below simply provides more explanation of these specific rationales.

Defendants further contend that the prior art identified in these Invalidity Contentions is evidence of simultaneous or near-simultaneous independent invention by others of the alleged invention as recited in one or more of the Asserted Claims. Defendants reserve their right to rely on the simultaneous or near-simultaneous independent invention by others as further evidence of the obviousness of the Asserted Claims.

Each limitation of the Asserted Claims was well-known to those of ordinary skill in the art before the alleged priority date of the Asserted Patents, as detailed below and in the attached Prior Art Invalidity Charts. The elements recited in the Asserted Claims are mere combinations and modifications of these well-known elements. A person of ordinary skill in the art would have been able and motivated to improve the existing technology in the same or similar manner by combining or modifying the individual elements that were already known in the art to yield predictable results.

Subject to the foregoing, Defendants identify the following exemplary reasons that skilled artisans would have combined elements of the prior art to render obvious the Asserted Claims. The fact that others are not discussed more

specifically should not be interpreted as an admission or concession that they do not apply. To the contrary, the discussion below simply provides more explanation of these specific rationales.

### a. Motivations Identified During Prosecution

Defendant hereby expressly incorporates by reference any statements and reasons set forth by the Examiner during prosecution of the asserted patents and related patent applications as to why it would have been obvious to modify or combine references to achieve the limitations of the asserted claims.

### b. Combinations of References Through Citations

Numerous prior art references cite to, discuss, or build upon other references. Where one reference cites or discusses another reference, a person of ordinary skill in the art would have been motivated to consider their teachings in combination, as they would be understood to provide related teachings in a similar field.

### c. Combinations of Related References

In some instances, multiple prior art publications and/or physical references discuss or address the same or substantially similar underlying system, software, or other project, such as commercial software products and successive versions thereof, or multiple publications discussing the same subject matter. Where multiple references discuss or relate to the same or related underlying projects, systems, or other subject matter, it was obvious to combine the discussions and disclosures of the references as they would be understood to describe features or potential features of the underlying project, system, technique, or other subject matter. Similarly, where one reference cites or discusses other references or their teachings, or references have one or more authors in common and a related area of subject matter, it was obvious to consider the teachings of the references in combination with each other due to the express relationships and commonalities between the references.

Further, for each set of references that together refer to or describe the same system and/or potential improvements to the same system, it would have been obvious to combine such references. In particular, to the extent the items are commonly owned, they would be within the knowledge of the same company, and the company would be motivated to use elements from one reference to improve another seeking to solve the same or similar problems.

Where more than one references discuss a system, as listed below, or where references are owned by the same company, same or overlapping inventor(s), and/or related companies, it would have been obvious to combine any such references that refer to and/or discuss the same system and/or are owned by the same company.

### d.    Motivation to Combine by Subject Matter

(1)    Bed Device Thermal Regulation

The Asserted Claims recite temperature control functionality operatively coupled to a bed device and configured to regulate the temperature of the bed or a portion thereof in response to generated control signals. The claims encompass regulating temperature of a portion or zone of a bed device, independently controlling multiple zones, and generating and transmitting control signals to set, adjust, or control bed temperature, including turning the bed device on or off. (*See* ~~'461 Patent, cls. 1, 14, 18; *see also* '~~'240 Patent, cls. 1, 10; '339 Patent, cls. 1, 4.)

Before the earliest alleged priority date, temperature control devices for beds and mattresses, including zoned and independently controlled systems, as well as systems responsive to user input or sensed conditions, were well known and widely available. For example, certain references disclose the following motivations to combine:

> · "Optionally, support cells incorporating fluid or gaseous materials could also increase or decrease in temperature in response to commands issued by software on the controller, 200, to the support cells, 120, through the communications cabling, 210. The system can optionally provide heating or cooling to the

user/sleeper's body from various temperature control systems including but not limited to radiant, hydronic, forced air, etc." (*Blumberg*, ¶ [0022].)

· "The elastic body unit 20 in the mattress device according to the fourth embodiment is for a double bed. The heater unit 42 is disposed on each of the right side and the left side of the elastic body unit 20. As shown in FIG. 8, the heater unit 42 is disposed below the lower surface of the unit body 22. The biological information detection unit 41 is disposed on the right side and the left side of the elastic body unit 20, respectively. As shown in FIG. 8, the biological information detection unit 41 is interposed between the lower surface of the unit body 22 and the upper surface of the heater unit 42. Therefore, the heating means 30 and the pressure detection means 31 in the mattress device of the fourth embodiment are separated from each other in the thickness direction of the elastic body unit 20." (*Inoue*, ¶ [0064].)

· "The system comprises a bedding layer comprising a plurality of thermally adjustable zones, a plurality of temperature sensors, wherein at least one temperature sensor per thermally adjustable zone is dispersed throughout the bedding layer. The thermally adjustable zones can be controlled separately, and means for controlling the heating power of each of said thermally adjustable zones depending on whether or not a part of the person's body is present in the area of said thermally adjustable zone." (*Van Driel*, p.3.)

· "According to an embodiment, the sleep system temperature adjustment unit 203 may include a wide variety of conventional heating and cooling mechanisms." (*Oexman*, ¶ [0024].)

· "This invention relates, generally, to bedding systems and, more particularly to an improved blanket with multiple zones with adjustable insulation properties." (*Stern*, ¶ [0002].)

· "[T]he bed detection means for detecting the bed of the sleeping person, the air within the bed and blower means for sending, a heating means for raising the temperature of the air from the blower means, at least one of the start-up or control for stopping of the blowing means, the heating means is connected to the standing floor detection means and the temperature and humidity

detection means it is provided with a device control means for outputting a signal." (*Matsunaka*, ¶ [0008].)

· "Further, as a control method, a portion where a person is present may be segmented on the electrically controlled air mattress 1 and each portion may be independently controlled in temperature and controlled in accordance with a sleep state." (*Sato*, p.9.)

· "[T]he temperature measured by the temperature sensor 10, the temperature control unit 8 controls the in-bed temperature by turning on / off a power supply (not shown) of the heating sheet 9 laid on the bed 21. In other words, the sleeping environment temperature control device is not limited to a sheet-like member and may be applied to any bedding ... and may be an electric heating type bedding such as a heating mattress or an electric blanket . . . ." (*Nemoto*, ¶ [0033].)

· "Temperature control apparatus 10 is utilized to control the temperature of a mattress 14, of any of a variety of types. For example, mattress 14 may be an air mattress, a waterbed mattress, or a conventional fiber/coil filled mattress." (*Larson*, 2:49-52.)

· "Preferably, a system for temperature control in a bed is disclosed comprising: a bed, at least two temperature sensors located at different locations in the bed, at least one heating means comprised by the bed and a processing unit . . . ." (*Koninkl Philips*, ¶ [0044].)

· "In a first aspect of the present invention a sleep element for improving the sleep of a person is presented, wherein the sleep element being adapted to be used within a bed and comprises ... a thermal energy unit for transferring thermal energy to or away from the person . . . ." (*Chestakov*, ¶ [0009].)

· "1. The temperature of the bed can be controlled according to the measured temperature of the bed. To this end, the bed is provided with a temperature coil 110 or the like, adapted to be controlled by a temperature control unit 112. The temperature coil 110 can thus be adapted to heat and/or cool the lying part, for instance by means of an electric coil or a suitable flowing medium." (*Bader*, ¶ [0024].)

· "[T]he smart bed 14a may be configured to implement the thermal transducers 78 in order to care for the patient 24a. . . . The smart bed system 10 can control the thermal transducers 78 in response to such a command in order to produce a low temperature environment within the smart bed 14a." (*Warner*, ¶ [0050].)

The references identified in the accompanying claim charts teach temperature control devices and control signal architectures encompassing all such features recited in the Asserted Claims. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that these temperature control configurations were conventional and within the knowledge of a person of ordinary skill in the art and further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

(2). <u>Biological Signal Sensing Integrated into a Bed Device</u>

The Asserted Claims recite biological signal sensing integrated into a bed device, including detecting one or more biological signals of a user positioned on the bed. The claims encompass sensors positioned in or forming part of the bed device that obtain biological signals, including signals obtained from one or more users and, in certain claims, signals measured during sleep sessions or obtained using specified sensor types. The recited biological signals include, for example, heart rate, breathing rate, temperature, motion, and compound biological signals, as well as processing or filtering of such signals. (*See* '461 Patent, cl. 1; *see also* '240 Patent, cls. 1, 8, 9; '339 Patent, cls. 1, 2, 3, 9-11, 22.) For example, certain references disclose the following motivations to combine:

· "[A]n embodiment of the system is comprised of a bed, 100, composed of an array plurality of individual support cells, 120, mounted within a bed frame, 110. The support cells 120 may comprise any suitable actuating means, including, e.g., electromagnetic, hydraulic, electrical, plasma, servo, piston, or screw-type actuators. Each support cell 120 may further comprise any suitable sensor device, including, e.g., one or more mechanical, optical, electrical, pressure, infrared, millimeter wave, sonar, GPS, and temperature sensors, that together can be used to determine, for example, the position of the body or specific body parts." (*Blumberg*, ¶ [0015].)

· "A technique is known in which pressure detection means is attached to a mattress of a bed apparatus and biological information is extracted from the pressure generated by the living body. The biological information here refers to at least one selected from the presence / absence, size, frequency, etc. of the heartbeat, respiration, and body movement of the living body. In general, the pressure detection means detects a pressure generated by a living body (hereinafter simply referred to as pressure) and outputs a pressure signal corresponding to the pressure." (*Inoue*, ¶ [0002].) "The heating means 30 consists of a heater wire. The pressure detecting means 31 is made of a piezoelectric film. Since the piezoelectric film converts pressure into electric power, the pressure detection means 31 outputs an electrical signal corresponding to the pressure. The temperature detecting means 32 is a thermistor type temperature sensor." (*Id.*, ¶ [0028].)

· "According to the second aspect of the invention, a system is provided which comprises a bedding layer comprising a plurality of thermally adjustable zones, a plurality of temperature sensors, wherein at least one temperature sensor per thermally adjustable zone is dispersed throughout the bedding layer . . . ." (*Van Driel*, p.6.)

· "Additionally, as shown in FIGS. 2 and 3, each of a plurality of comfort layer sensors 228 are connected to a respective one of the comfort layer inflatable members 224. Each of the comfort layer sensors 228 is configured to provide real time measurements relating to the pressure of a respective comfort layer inflatable member 224." (*Oexman*, ¶ [0037].)

· "In accordance with a further embodiment of the present invention, the bedding system includes one or more sensors incorporated into the blanket for sensing and controlling the respective temperatures of the zones in a close-loop fashion." (*Stern*, ¶ [0034].)

· "On top mattress 2 is disposed bag 3, which is a piezoelectric element 6 is disposed a temperature sensor 4, the humidity sensor 5, the bed detection means is a temperature and humidity sensing means further thereon." (*Matsunaka*, ¶ [0017].)

· "One or a plurality of the biological information detecting means 2 may be dispersedly arranged in the electrically controlled air mattress 1, and the biological information detecting means 2 may have a function of detecting a temperature." (*Sato*, p.7.)

· "That is, the sleeping environment temperature control device includes a biological signal detection unit 1 that detects a biological signal of a user lying on a bed 21 ... an automatic gain control unit 4 that automatically performs gain control on a heartbeat signal and / or a respiration signal that has passed through the filter unit 3 . . . ." (*Nemoto*, ¶ [0021].)

· "In addition to detecting the presence and absence of an occupant, the occupant sensors 60 and 62 may include sensors for detecting the body core temperature of the occupant. Various apparatus are available to form this function, including contacts which measure skin temperature at various locations and which then

process the various skin temperatures to determine body core temperature." (*Larson*, 3:58-64.)

· "Fig. 1 shows a system for temperature control in a bed according to the invention. The system comprises five temperature sensors (1) that are positioned in the mattress (6) of a bed." (*Koninkl Philips*, ¶¶ [0062][0063].)

· "The sleep element 201, i.e. in this embodiment the underblanket 201, comprises a property determination unit 202 being a skin temperature sensor. The skin temperature sensor 202 is embedded in the underblanket 201." (*Chestakov*, ¶ [0062].)

· "The lying part 102 is provided with a plurality of sensors 106 for measuring one or more physical magnitudes with a person staying in the bed. The sensors 106 can be adapted to measure one or more of the following physical magnitudes: temperature, pressure, movements, sound and moisture." (*Bader*, ¶ [0010].)

· "[T]he bed sensors 62a-62n may include one or more pressure sensors and/or mass sensors. Pressure sensors may be used to identify the presence of the patient 24a within the smart bed 14a, to monitor patient movement into and out of the smart bed 14a, and to monitor patient movement within the smart bed 14a." (*Warner*, ¶ [0042].)

The references identified in the accompanying claim charts teach bed-integrated biological signal sensing systems and signal acquisition architectures encompassing the biological sensing features recited in the Asserted Claims. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that biological signal detection in bed or mattress systems, including detection of heart rate, breathing rate, temperature, motion, and compound biological signals, was conventional and within the knowledge of a

person of ordinary skill in the art. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### (3). Detecting Different Types of Body Signals

The Asserted Claims recite detecting and processing different types of biological signals obtained from a user of the bed device. The claims encompass obtaining first and second biological signals of different types, as well as biological signals including heart rate, breathing rate, temperature, motion, and compound biological signals. Certain claims further specify that a second biological signal may comprise heart rate or breathing rate, and that compound biological signals may be obtained and processed. (*See* '461 Patent, cl. 3; *see also* '240 Patent, cls. 2, 5; '339 Patent, cls. 9-11, 22.)

Before the earliest alleged priority date of the Asserted Patents, the detection and use of multiple types of biological signals, including heart rate, respiration, temperature, motion, and combinations thereof, were well known in sleep monitoring systems, medical monitoring systems, and related sensor technologies. For example, certain references disclose the following motivations to combine:

· "Each of the support cells, 120, may include one or more sensors integrated with the support cell, so as to be capable of measuring resistance, pressure, actuator position, heat, or other measurable state to determine any or all of the following: (a) if any body part, such as the knee, shoulder, elbow, toes, head, or breast, is on that cell; (b) if there is a sharp and/or bony body part, such as an elbow, or toe, on that cell; and/or (c) if there is soft tissue such as the belly, on that part of the bed." (*Blumberg*, ¶ [0016].)

· "A technique is known in which pressure detection means is attached to a mattress of a bed apparatus and biological information is extracted from the pressure generated by the living body. The biological information here refers to at least one selected from the presence / absence, size, frequency, etc. of the heartbeat, respiration, and body movement of the living body." (*Inoue*, ¶ [0002].)

- "The algorithm uses the knowledge of at least one of the group consisting of the set temperature, the room temperature, the human metabolic rate, skin temperature, and at least one of the difference in temperature change with or without a person present, the difference in power consumption for maintaining a set temperature with or without a person present, and the actual temperature, with respect to each one of the plurality of temperature sensors." (*Van Driel*, pp.10-11.)

- "Consistent with the present invention, the support layer sensors 238 and the comfort layer sensors 228 provide the ability to measure a wide variety of data. For example, when a person is positioned on the variable sleep system 201, data provided by the support layer sensors 238 and the comfort layer sensors 228 can be analyzed to determine, among other things, the person's weight, weight distribution, body position, body movement, breathing rate, heart rate, state of sleep, etc." (*Oexman*, ¶ [0040].)

- "More particularly, referring now to FIG. 3, bedding system 100 includes a sensor 302 (e.g., a thermocouple or the like) which is suitably positioned and provided within, on, or under blanket 102 in region 104 to sense a temperature associated with region 104, e.g., the temperature of the interior of blanket 102, the temperature of a surface of blanket 102, or the temperature of an individual lying beneath blanket 102." (*Stern*, ¶ [0034].)

- "In addition, if there is a human body on the mattress 2, the piezoelectric element 6 is deformed human heart on the mattress 2, by body movement such as breathing and rolling over, voltage by the piezoelectric effect occurs." (*Matsunaka*, ¶ [0019].)

- "[T]he temperature sensor 4 and the humidity sensor 5 changes the respective resistance values in response to changes in temperature and humidity in the bed. In the control circuit 11 to calculate the temperature and humidity in the bed than these resistance value." (*Matsunaka*, ¶ [0018].)

- "Reference numeral 3 denotes biological state information indicating the state of the living body from the output of the biological information detecting means 2, such as the pulse rate, the cessation of the pulse, the respiratory rate, the cessation of breathing, the body movement, the continuation of the body movement, and the state of snoring." (*Sato*, p.7.)

  - "That is, the biological signal detected by the biological signal detection unit 1 is a signal in which various vibrations generated from the human

body are mixed, and includes various signals such as a heartbeat signal, a respiration signal, and a body motion signal indicating turning over."

(*Nemoto*, ¶ [0028].)

· "In a further preferred embodiment of the invention the system additionally comprises a presence sensor . . . . Preferably the presence sensor is a pressure, temperature, motion, and/or IR sensor to detect the presence of a person in the bed." (*Koninkl Philips*, ¶ [0059].)

· "The determined property can also directly be the movement signal or another property like the skin temperature of the person or the heart beat of the person." (*Chestakov*, ¶ [0076].)

· "The sensors 106 can be adapted to measure one or more of the following physical magnitudes: temperature, pressure, movements, sound and moisture." (*Bader*, ¶ [0010].)

· "[T]he bed sensors 62a-62n may include one or more pressure sensors and/or mass sensors. Pressure sensors may be used to identify the presence of the patient 24a within the smart bed 14a, to monitor patient movement into and out of the smart bed 14a, and to monitor patient movement within the smart bed 14a. As an example, if the pressure sensors indicate excessive patient inactivity it may become necessary to implement precautionary measures . . . . Mass sensors may be implemented to monitor patient weight loss and gain." (*Warner*, ¶ [0042].)

The references identified in the accompanying claim charts teach these same categories of biological signals and their use in monitoring and control systems. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that the use of different types of biological signals, including compound signals, was conventional and within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success.

Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

(4). **User / Occupant Detection**

The Asserted Claims recite detecting the presence of a user on a bed device based on one or more biological signals. The claims encompass detecting a biological signal when a user is positioned in a portion of the bed device, using biological signals to indicate the presence of a user in a particular zone of the bed, and using a first biological signal to indicate user presence prior to or in connection with temperature control. (*See* '461 Patent, cls. 1, 19; *see also* '240 Patent, cl. 1; '339 Patent, cl. 1.)

Before the earliest alleged priority date of the Asserted Patents, using physiological or biological signals to detect occupancy or presence in beds, mattresses, and related systems was well known. For example, certain references disclose the following motivations to combine:

· "Each support cell 120 may further comprise any suitable sensor device, including, e.g., one or more mechanical, optical, electrical, pressure, infrared, millimeter wave, sonar, GPS, and temperature sensors, that together can be used to determine, for example, the position of the body or specific body parts." (*Blumberg*, ¶ [0015].) "The system may also provide the capability for a sleeping person to maintain one or more prescribed positions of the spine throughout a night's sleep even when the person may roll over and changes positions many times throughout the night." (*Id.*, ¶ [0037].)

· "When the living body 50 lies on the mattress device, pressure is applied to the elastic body unit 20. This pressure is transmitted to the pressure detection means 31 disposed below the elastic body unit 20. The pressure detection means 31 detects the pressure generated by the living body 50 and outputs a pressure signal corresponding to this pressure."

(*Inoue*, ¶ [0033].)

· "The system can detect the presence or absence of a living person in a bed by means of the temperature sensors the bedding layer is provided with." (*Van Driel*, p.8.)

· "In addition, if there is a human body on the mattress 2, the piezoelectric element 6 is deformed human heart on the mattress 2, by body movement such as breathing and rolling over, voltage by the piezoelectric effect occurs." (*Matsunaka*, ¶ [0019].)

· "When the on / off control of the output of the electric control air mattress 1 is performed, the control means 4 determines that no person exists on the electric control air mattress 1 when the biological condition information cannot be obtained, and performs the electric control. The air mattress 1 is turned off so that the output becomes zero, and when biological condition information is obtained, it is determined that a person exists on the electric control air mattress 1 and the on control is performed." (*Sato*, p.8.)

· "The biological signal detection unit 1 is a non-invasive and non-restraint sensor that detects a minute biological signal of a user. To be specific, the biological signal detection unit 1 includes a pressure detection tube 1a and a minute differential pressure sensor 1a which is a sensor for detecting a minute pressure fluctuation of air contained inside the pressure detection tube 1b and constitutes a noninvasive and unconstrained biological signal detection means." (*Nemoto*, ¶ [0022].)

> · "In addition to detecting the presence and absence of an occupant, the occupant sensors 60 and 62 may include sensors for detecting the body core temperature of the occupant. Various apparatus are available to form this function, including contacts which measure skin temperature at various locations and which then process the various skin temperatures to determine body core temperature." (*Larson*, 3:58-64.)
>
> · The presence detector is directly connected to the heater control (4) and will turn [off] the heater control if no person is detected lying in the bed." (*Koninkl Philips*, ¶ [0070].)
>
> · "[I]f the movement signal exceeds the uncomfortable threshold, which is preferentially preset, i.e. if the detected activity of the person exceeds the uncomfortable threshold ... adds some more power to the giving heating, if the blanket is already heating the person." (*Chestakov*, ¶ [0051].)
>
> · "The following information about the person can thus be provided by means of measured values from the sensors: The person's movements, such as turning over in the bed. Sound, such as detection of snoring. The person's breathing activity that can be

registered through movements and/or sound. The person's heart activity which can also be registered through movements and/or sound. Temperature of the person and of the air." (*Bader*, ¶¶ [0014]-[0019].)

· "[T]he bed sensors 62a-62n may include one or more pressure sensors and/or mass sensors. Pressure sensors may be used to identify the presence of the patient 24a within the smart bed 14a, to monitor patient movement into and out of the smart bed 14a, and to monitor patient movement within the smart bed 14a." (*Warner*, ¶ [0042].)

The references identified in the accompanying claim charts teach the use of biological signals, including heart rate, respiration, temperature, or motion, to determine whether a user is present in a bed or a particular portion of a bed. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that presence detection based on biological signals was conventional and within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

(5) User Identification Based on Biological Signal

The Asserted Claims of the '461 Patent recite identifying a user from a plurality of users based on a biological signal detected by a sensor integrated into the bed device. Specifically, the processor is configured to identify a particular user from among multiple users using biological signal data and to regulate the temperature of a portion of the bed based on that user's identity. (*See* '461 Patent, cl. 1.)

Before the earliest alleged priority date of the Asserted Patents, the use of biological signals to identify or differentiate between users in monitoring systems was

well known. For example, certain references disclose the following motivations to combine:

- "The system may be programmed to create profiles stored on the controller which may be used to identify different users by, without limitation, body shape and/or by the user inputting their name or otherwise identifying themselves. Such profiles enable the system the to issue commands to change the position of individual support cells within the array of support cells in accordance with the profile, enabling the system perform, without limitation, one or more of the functions described in this disclosure for a specific user." (*Blumberg*, ¶ [0050].)

- "Therefore, we here propose a new strategy based on ballistocardiogram (BCG), which can be easily collected through simple measuring devices installed on a weight scale [13] or a chair [14], for person identification." (*Guo*, p. 570.) "We proposed a novel person identification system based on cardiac mechanical signal BCG. We investigated the feasibility of the system using time-dependent correlation analysis. 24 out of 25 subjects could be correctly identified by the system. It was shown that BCG carried identity information especially in the H I J K L components, i.e., the early phase of a cardiac cycle." (*Id.*, p.573.)

- "At step 204, the method 200 confirms the identity of the patient 24a . . . . . Other known identification technology such as, for example, finger print, retinal scan, voice recognition, etc. can also be incorporated into the smart bed 14a . . . ." (*Warner*, ¶ [0056].)

The references identified in the accompanying claim charts teach the use of biological signals, including cardiac or respiratory signals and other physiological characteristics, to distinguish between individuals or to associate detected signals with stored user profiles. Defendants incorporate by reference the disclosures cited in the

accompanying prior art claim charts as evidence that identifying or differentiating users based on biological signals was conventional and within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### (6)5.    Multi-User Biological Signal Recognition

The Asserted Claims recite acquiring biological signals from multiple users of a bed device in certain configurations. The asserted claims of the '461 Patent require identifying a user from a plurality of users based on a detected biological signal, thereby presupposing the acquisition of biological signals from multiple potential users of the same bed device. (*See* '461 Patent, cl. 1.) The asserted claims of the '240 Patent expressly require obtaining at least one first biological signal from a first user positioned in a first zone of the bed device and at least one second biological signal from a second user positioned in an adjacent second zone. (*See* '240 Patent, cls. 1, 5.)

Before the earliest alleged priority date of the Asserted Patents, acquiring and processing biological signals from multiple users in a shared bed or sleep system, including signals associated with different zones or portions of a mattress, was well known. For example, certain references disclose the following motivations to combine:

> · "The system may be programmed to create profiles stored on the controller which may be used to identify different users by, without limitation, body shape and/or by the user inputting their name or otherwise identifying themselves. Such profiles enable the system the to issue commands to change the position of individual support cells within the array of support cells in accordance with the profile, enabling the system perform,

without limitation, one or more of the functions described in this disclosure for a specific user." (*Blumberg*, ¶ [0050].)

· "Therefore, for example, even when only the heating means 30 on the one living body 50 side is in the on state and the heating means on the other living body 51 side is in the off state, the temperature detecting means 32 of each living body information detection unit 41. Can accurately detect the ambient temperature. Also by this, the mattress device according to the fourth embodiment can individually extract highly accurate biological information for two different living bodies 50 and 51." (*Inoue*, ¶ [0067].)

· "Adjustments to the variable comfort layer 220 and the variable support layer 230 may be performed automatically based on body variances of the person, or manually based on the person's comfort and support preferences." (*Oexman*, ¶ [0028].)

· "For example, the control unit 12 could turn off the heating elements 42, 44, 46, and 48 when one or both sides of the bed are unoccupied. The timer would permit a time delay before turning off the heating devices, to permit the occupant to leave and return to the bed within a predetermined amount of time." (*Larson*, 3:52-57.)

· "At step 202, the method 200 confirms the presence of the patient 24a (shown in FIG. 1) within the smart bed 14a (shown in FIG. 1). This confirmation may be based on data from the RFID device 50 (shown in FIG. 3) or on feedback from the sensors 42 (shown in FIG. 3). In the embodiment wherein the RFID device 50 is implemented to confirm patient presence, there may be situations in which two or more patients 24a-24n (shown in FIG. 1) are close enough to a single smart bed 14a . . . ." (*Warner*, ¶ [0055].)

The references identified in the accompanying claim charts teach systems capable of detecting biological signals from more than one user and associating those signals with particular bed regions or user profiles. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that multi-user biological signal acquisition and association were conventional and within the knowledge of a person of ordinary skill in the art before

the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### (7)6.   Zoned Climate Control

The Asserted Claims recite regulating temperature for one or more portions of a bed device, including independent control of different zones in certain embodiments. The claims encompass independently regulating a plurality of zones within a bed device and generating separate control signals to set a first zone to a first temperature and a second zone to a second temperature different from the first, as well as regulating the temperature of a bed device for a single user. (*See* '461 Patent, cl. 9; *see also* '240 Patent, cl. 1.)

Before the earliest alleged priority date of the Asserted Patents, zoned and independently controlled temperature regulation in beds, mattresses, and related sleep systems was well known. For example, certain references disclose the following motivations to combine:

- "Optionally, support cells incorporating fluid or gaseous materials could also increase or decrease in temperature in response to commands issued by software on the controller, 200, to the support cells, 120, through the communications cabling, 210. The system can optionally provide heating or cooling to the user/sleeper's body from various temperature control systems including but not limited to radiant, hydronic, forced air, etc." (*Blumberg*, ¶ [0022].)

- "The mattress device according to the fourth embodiment includes an elastic body unit 20, two biological information detection units 41, and two heater units 42." (*Inoue*, ¶ [0061].)

- "In a first aspect of the invention it is an objective to provide a method for improving a person's sleep. The method comprises . . . adjusting the temperature of each individual thermally

adjustable zone of the bedding layer such that the temperature of each individual thermally adjustable zone in which areas a part of the person's body is present is maintained at a preset temperature." (*Van Driel*, pp.2-3.)

· "By adjusting both the variable comfort layer 220 and the variable support layer 230, it is possible to adjust the variable sleep system 201 so that it provides the best possible combination of zoned comfort and support to the person. Adjustments to the variable comfort layer 220 and the variable support layer 230 may be performed automatically based on body variances of the person, or manually based on the person's comfort and support preferences." (*Oexman*, ¶ [0028].)

· "The present invention overcomes shortcomings in the prior art by providing a multi-zone bedding system including a blanket defined by two or more zones and a controller configured to independently modify the insulation value of one or more of those zones to suit the personal preferences of individuals using the system." (*Stern*, ¶ [0031].)

· "Further, as a control method, a portion where a person is present may be segmented on the electrically controlled air mattress 1 and each portion may be independently controlled in temperature and controlled in accordance with a sleep state." (*Sato*, p.9.)

· "Each heat zone 34, 36, 38 and 40 is heated by a heating element 42, 44, 46, and 48 respectively, which are individually connected to the control unit 12 for selective activation and control. (*Larson*, 3:3-6.)

The references identified in the accompanying claim charts teach systems capable of independently controlling temperatures in different regions of a bed or mattress, including configurations for multiple users. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that zoned and independently regulated temperature control was within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable

expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### (8)7.    Stored User Data / Preferences

The Asserted Claims recite storing user-related data and preferences in connection with operation of the bed device. The claims encompass storing biological signal data in a database accessible to a processor, associating such data with a particular user, and defining a user's identity to include stored temperature preferences, a target wake time, or sleep phase. The claims further encompass storing biological signals measured during sleep sessions and determining or storing a historical bedtime based on prior sleep-session measurements, including transmitting biological signal data to a database. (*See* '461 Patent, cls. 1, 11, 12, 20; *see also* '240 Patent, cls. 11, 12, 15; '339 Patent, cls. 5, 28.)

Before the earliest alleged priority date of the Asserted Patents, storing user-user-specific specific data, preferences, and historical measurements in databases for use in subsequent control decisions was well known in sleep systems, environmental control systems, and related monitoring technologies. For example, certain references disclose the following motivations to combine:

- "The system may be also set to wake up the sleeper after the sleeper has slept for a certain amount of time or optionally after the sleeper has experienced a certain amount of REM sleep or optionally based on other criteria chosen by the computer or the user." (*Blumberg*, ¶ [0048].)

- "The biological information extraction unit has a signal processing unit (not shown), a biological information calculation unit (not shown), and a storage unit (not shown) . . . . The storage unit stores in advance output characteristic data of pressure detecting means 31 (piezoelectric film) corresponding to temperature, a heart rate threshold value, two temperature threshold values, and biological characteristic data corresponding to biological information." (*Inoue*, ¶ [0031].)

· "According to the embodiment shown in FIG. 3, the sense and control unit 250 is connected to a database 390 that can be integrated with the embedded control unit 300 or external thereto." (*Oexman*, ¶ [0032].)

· "[T]he sleeping environment temperature of the heating sheet 9 at the time of getting in bed is arbitrarily set under the operation of the user . . . . The comfortable in-bed temperature when the user is awake while in bed varies depending on the user, and is therefore set by the user." (*Nemoto*, ¶ [0035].)

· "Finally, a remote input/display unit 66 is interconnected with control unit and CPU 12, to permit the programming of the control unit and CPU from any remote location, as well as to display the current settings and conditions of devices controlled by control unit 12." (*Larson*, 4:3135.)

· "The sleep element 201 further comprises a property recording unit 207 for recording properties of the person 217, which have been determined during sleeping. In this embodiment, the property recording unit 217 is adapted to store the measured temperatures in a memory, while the person is sleeping. The recorded properties of the person 217 form a recorded property pattern." (*Chestakov*, ¶ [0063].)

· "The registration unit 104 comprises a programmable processor 108 for receiving and processing measured values M from the sensors 106. Thus the registration unit 104 is adapted to receive, process and analyse measured values obtained from the sensors 106 in order to obtain information about the person." (*Bader*, ¶ [0012].)

· "At step 208, the smart bed 14a (shown in FIG. 1) implements the care plan 32 (shown in FIG. 1) that was downloaded at step 206 . . . . At step 210, the smart bed 14a implements any patient preferences that were downloaded at step 206. Implementation of any patient preferences may include, for example, adjusting the bed position and/or temperature in a preferred manner . . . ." (*Warner*, ¶ [0060].)

The references identified in the accompanying claim charts teach storing

biological signal data, user preferences, and historical sleep information in memory or database systems for later retrieval and use in automated control processes. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that storing user data, preferences, and historical sleep information was conventional and within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### (9)8.   System Architecture / Data Storage Association

The Asserted Claims recite a processor coupled to the biological sensor and the temperature control device and configured to generate and transmit control signals for regulating bed temperature based on detected biological signals. The claims further encompass a sleep system comprising a processor and memory storing instructions for implementing the claimed methods. (*See* '461 Patent, cl. 1; *see also* '240 Patent, cl. 29; '339 Patent, cl. 29.)

Before the earliest alleged priority date of the Asserted Patents, the use of processors and associated memory to receive sensor data, execute stored instructions, and generate control signals for automated systems was well known in sleep systems, and related monitoring technologies. For example, certain references disclose the following motivations to combine:

· "The controller, 200, has one or more software programs resident on the controller which are capable of analyzing data received from sensors on support cells, 120, sensors on the bed frame, and sensors external to the system. The controller, 200, also has one or more software programs resident on the controller which are capable of controlling support cells, 120, and any other devices, for example, heating or cooling devices,

incorporated within the support system, 100." (*Blumberg*, ¶ [0024].)

· "For example, the system may gather data on, without limitation, the speed of onset of sleep, maximum REM sleep (by, for example, using sensors to constantly obtain data on the user's eyes), the length of REM sleep, the number of REM sleep episodes, the amount of time needed to begin first REM sleep episode, the number of total hours of sleep, the number of occurrences of rolling around, the number of occurrences of waking up in the middle of the night, etc. Such data may be compiled over many nights of an individual's sleep and correlated to all conditions and settings of the system." (*Blumberg*, ¶ [0048].)

· "The determination unit refers to the biological characteristic data stored in the storage unit, and determines the state of the living body 50 (whether or not the living body 50 has fallen asleep) based on the biological information extracted by the biological information calculation unit." (*Inoue*, ¶ [0037].)

· "In the third aspect, the invention provides a computer program product for improving a person's sleep, wherein the computer program includes an algorithm for detecting the position of a body on or underneath a bedding layer . . . . The algorithm uses this information in controlling the heating or cooling power applied to each of the individual thermally adjustable zones." (*Van Driel*, pp.10-11.)

· "A controller in accordance with one embodiment of the present invention includes a pump, compressor, or other form of air supply controlled via a microprocessor and associated electronics, including a user interface which allows individuals to modify the characteristics of the blanket as desired. Referring to FIG. 9, for example, an exemplary controller 110 includes a microprocessor 904, a memory 906, a user interface 910, and a pump control block 908 communicating over a data bus 922." (*Stern*, ¶ [0048].)

· "When a recording device is provided, a locally useful control parameter can be estimated. For example, the user himself knows the state of a good sleep state, and this is useful for

individual adjustment (optimization) of updating the control parameter adjustment." (*Sato*, pp.9-10.)

· "That is, the sleeping environment temperature control device includes a biological signal detection unit 1 that detects a biological signal of a user lying on a bed 21, a signal amplification unit 2 that amplifies the biological signal detected by the biological signal detection unit 1, a filter unit 3 that performs a filtering process on the biological signal amplified by the signal amplification unit 2 . . . a variance value calculation unit 6 that calculates a variance value of the heartbeat intensity and / or the respiration intensity . . . . And a temperature control unit 8 that controls the in-bed temperature . . . ." (*Nemoto*, ¶ [0021].)

· "[T]he temperature control apparatus of the present invention is designated generally at 10 and includes a central control unit 12, including a central processing unit for receiving, transmitting and processing information. Temperature control apparatus 10 is utilized to control the temperature of a mattress 14 . . . ." (*Larson*, 2:43-2:50.)

· "The processing unit may be any suitable processing unit known to the skilled person . . . . For example, the processing unit may comprise a microprocessor that is adapted/programmed to carry out steps of the method according to the present invention, preferably the steps related to the determination if a measured temperature is the skin temperature of a person present in the bed and/or the control of the heating means." (*Koninkl Philips*, ¶ [0052].)

· "A sleep computer program for improving the sleep of a person, the sleep computer program comprising program code means for causing a sleep element as defined in claim 1 to carry out the steps of the sleep method as defined in claim 15, when the sleep computer program is run on a computer controlling the sleep element." (*Chestakov*, cl. 16.)

· "The registration unit 104 can be programmed to process received measured values in order to perform a more or less continuous analysis of the person's state, for instance with regard to wakefulness, sleep depth, dream activity and phase in

DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

the sleep cycle. This information can then be used to optimise comfort and sleep quality by one or more measures being taken." (*Bader*, ¶ [0023].)

· "The smart bed includes a smart bed computer operatively connectable to one or more monitoring devices. The smart bed computer is configured to store any monitored data recorded by the monitoring devices. The smart bed system also includes a server coupled with the smart bed computer. The server is configured to store any patient data pertaining to the patient." (*Warner*, ¶ [0007].)

The references identified in the accompanying claim charts teach processor-based control systems in which sensor data is received, processed, and used to generate control signals, including systems incorporating memory or database components storing instructions or user-related data. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that such processor and memory architectures were conventional and within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### (10) 9.      Signal Processing/ Filtering

The Asserted Claims recite detecting and processing multiple biological signals, including obtaining different types of biological signals and filtering compound biological signals. The claims encompass obtaining first and second biological signals of different types, detecting compound biological signals comprising multiple physiological parameters, and filtering such signals prior to use in temperature control. (*See* '240 Patent, cl. 6; '339 Patent, cls. 22, 23.)

Before the earliest alleged priority date of the Asserted Patents, detecting

multiple physiological signals and applying filtering techniques, including processing compound biological signals, was well known in sleep monitoring systems, and related sensor technologies. For example, certain references disclose the following motivations to combine:

·   "For example monitors may be employed within the system to gather information pertaining to quality and duration of sleep, including but not limited to: brain wave scans, magnetic resonance imaging, measurement devices which monitor levels of various chemicals and gases in the body, and sleep apnea measurement devices, etc. Such data would be communicated to the controller, 200, to allow the controller to take appropriate action to enhance the quality of a person's sleep." (*Blumberg*, ¶ [0047].)

·   "The signal processing unit performs filtering (waveform processing) on the pressure signal to extract a component (heart rate component) derived from the heartbeat. The biological information calculation unit extracts biological information from the heartbeat component extracted by the signal processing unit based on the temperature signal." (*Inoue*, ¶ [0031].)

·   "The calculation means in the mattress device according to the third embodiment extracts the heartbeat of the living body. As shown in FIGS. 6A and 6B, the signal processing unit filters the pressure signal 100 to extract the heart rate component 101. The biological information calculation unit extracts biological information (heart rate and heart rate) from the heart rate component 101 based on the temperature signal." (*Inoue*, ¶ [0055].)

·   "In addition, if there is a human body on the mattress 2, the piezoelectric element 6 is deformed human heart on the mattress 2, by body movement such as breathing and rolling over, voltage by the piezoelectric effect occurs. Then the control circuit 11, only a predetermined frequency component of the voltage output generated is filtered, amplified, then rectified and integrated. Figure 3 shows the integration output signal in real situations." (*Matsunaka*, ¶ [0019].)

·   "The filter unit 3 extracts a heartbeat signal and a respiratory signal by removing an unnecessary signal from the biological

signal amplified by the signal amplification unit 2 using a band pass filter or the like." (*Nemoto*, ¶ [0028].)

· "The following information about the person can thus be provided by means of measured values from the sensors: The person's movements, such as turning over in the bed. Sound, such as detection of snoring. The person's breathing activity that can be registered through movements and/or sound. The person's heart activity which can also be registered through movements and/or sound. Temperature of the person and of the air." (*Bader*, ¶¶ [0014]-[0019].)

The references identified in the accompanying claim charts teach obtaining

and processing multiple biological signals, including heart rate, respiration, temperature, motion, and combinations thereof, as well as filtering such signals using known techniques. Defendants incorporate by reference the disclosures cited in the accompanying prior art claim charts as evidence that multi-signal detection and filtering were conventional and within the knowledge of a person of ordinary skill in the art before the earliest alleged priority date. Defendants further rely on those disclosures for purposes of establishing anticipation and or obviousness, including motivations to combine and reasonable expectations of success. Defendants reserve the right to amend, supplement, or modify these contentions as discovery and expert analysis proceed.

### ~~F~~E.   Claim Charts

Subject to Defendants' reservation of rights, attached hereto as Exhibits ~~A-1 through A-9,~~ B-1 through B-6, and C-1 through C-9, and identified in Appendix B, incorporated by reference, are claim charts providing a limitation-by-limitation analysis of where specifically in each prior art item each limitation of the Asserted Claims of the Asserted Patents is found. Any reference to a figure in cited text incorporates by reference the figure itself, and any citation to a figure incorporates by reference any description of that figure in a reference.

As noted above, these claim charts are based on Defendants' understanding of the claim terms as interpreted by Eight Sleep in its Infringement Contentions—even though Defendants ~~does~~do not necessarily agree with those constructions and reserve the right to dispute them—and/or Defendants' potential constructions. Defendants reserve the right to supplement or modify these Invalidity Contentions in conjunction with the Court's rulings on claim construction. To the extent any limitation is deemed not to be met exactly by an item of prior art, Defendants contend~~s~~ that the difference would have been obvious to a person of ordinary skill in the art and within the knowledge of one skilled in the art at the time of the alleged invention, so that the claimed invention would have been obvious both in light of the single reference alone and/or in light of combined references. Defendants do not admit or concede that the element is not expressly or inherently disclosed by the reference at issue.

As a general matter, all portions of each prior art item are relied upon to support the disclosure of each patent claim limitation, as all portions provide general support. Supporting citations are nevertheless provided, but do not necessarily represent every location where a particular claim term may be found in the prior art item. Defendants reserve the right to rely on additional, or different, portions of the prior art items other than those specifically cited in these claim charts, and to supplement and/or amend these charts.

### ~~G~~F.   Charts Correlating Specific Claims to Specific References

Without limiting its interpretation of the Asserted Claims, its ability to use other references, or its ability to amend these Invalidity Contentions in accordance with the case schedule and any agreement between the parties, Defendants further provide the following charts that correlate specific claims to specific references and groups of references that have been defined above. The references identified for a specific claim may be used by themselves or in combination with the other references identified for that claim.

| ~~'461~~240 Patent, Asserted Claims | | Application of Prior Art Under § 103 |
|---|---|---|
| ~~Claim 1, 3, 9, 11, 12, 14, 18, 20~~ | | ~~• Bader~~ <br> ~~• Blumberg~~ <br> ~~• Chestakov~~ <br> ~~• Guo~~ <br> ~~• Inoue~~ <br> ~~• Koninkl Philips~~ <br> ~~• Larson~~ <br> ~~• Matsunaka~~ <br> ~~• Nemoto~~ <br> ~~• Oexman~~ <br> ~~• Sato~~ <br> ~~• Stern~~ <br> ~~• Van Driel~~ <br> ~~• Warner~~ |
| | ~~Each~~ | ~~of the foregoing combinations may also be supplemented with the knowledge of a person of in the art.~~ |

| ~~'240 Patent, Asserted Claims~~ | ~~Application of Prior Art Under § 103~~ |
|---|---|
| Claims 1, 2, 3, 5, 6, 8-12, 15, and 29 | · Bader <br> · Blumberg <br> · Chestakov <br> · Guo |

|  |  |
|---|---|
|  | · Inoue |
|  | · Koninkl Philips |
|  | · Larson |
|  | · Matsunaka |
|  | · Nemoto |
|  | · Oexman |
|  | · Sato |
|  | · Stern |
|  | · Van Driel |
|  | · Warner |
|  | - Warner Each of the foregoing combinations may also be supplemented |
|  | Each of the foregoing combinations may also be supplemented with the knowledge of a person of ordinary skill in the art. |

| '339 Patent, Asserted | | Application of Prior Art Under § 103 |
|---|---|---|
| Claims 1, 2, 3, 5, 9, 10, 11, 22, 23, 28, and 29 | | • Bader<br>• Blumberg<br>• Chestakov<br>• Guo |
| Claims 1, 2, 3, 4, 5, 9, 10, 11, 22, | | • Bader<br>• Blumberg |

| '339 Patent, Asserted Claims | Application of Prior Art Under § 103 |
|---|---|

No. 2:26-cv-02460-SB-KS
DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

| 23, 28, and 29 | · ~~Inoue~~Chestakov |
| | · Guo |
| | · Inoue |
| | · Koninkl Philips |
| | · Larson |
| | · Matsunaka |
| | · Nemoto |
| | · Oexman |
| | · Sato |
| | · Stern |
| | · Van Driel |
| | · Warner |
| | Each of the foregoing combinations may also be supplemented with the knowledge of a person of ~~ordinary skill in the art.~~ |

### ~~H~~G.    Secondary Considerations

Plaintiff bears the burden of coming forward with evidence regarding objective indicia of non-obviousness and their purported nexus to the asserted claims. *ZUP, LLC v. Nash Mfg., Inc*., 896 F.3d 1365, 1373 (Fed. Cir. 2018).

To date, Plaintiff has not provided any assertions on alleged indicia of non-obviousness of the asserted claims. Regardless, even if Plaintiff alleged any such indicia, any purported objective indicia of non-obviousness cannot overcome the prima facie showing of obviousness, as demonstrated by the teachings of the prior art and combinations described above. Additionally, the contemporaneous invention of the purported subject matter of the Asserted Claims by others in the field in fact serves as objective evidence of the contrary and that the Asserted Claims would have been obvious.

Defendants reserve the right to amend and/or supplement these Invalidity Contentions to the extent Plaintiff later presents new argument and/or evidence.

## II.   THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112 FOR

## INDEFINITENESS, LACK OF WRITTEN DESCRIPTION,  AND/OR LACK OF ENABLEMENT

Written description and enablement impose related requirements. *LizardTech, Inc. v. Earth Res. Mapping, Inc.,* 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). For written description, "the test . . . is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

The "enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.,* 501 F.3d 1274, 1282 (Fed. Cir. 2007) (citation omitted). The written description and enablement requirements are fundamental to the quid pro quo of the patent system, ensuring that the scope of the claims does not "overreach the scope of the inventor's contribution." *Ariad*, 598 F.3d at 1353-54, 1358 (citation omitted).

The alleged invention must also be claimed with enough precision to afford "clear notice" to the public of what is still open to them. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) (citation omitted). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id*. at 901. A patent must have "objective boundaries" so that those of ordinary skill can ascertain the scope of the invention. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir.

2014). There should be no "zone of uncertainty," the "invention must be capable of accurate definition," and the claims should not depend on "unpredictable vagaries" without objective boundaries. *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 23637 (1942); *Interval Licensing*, 766 F.3d at 1374 (citation omitted). When claims are a "matter of subjective perception," they are indefinite as a matter of law. *See, e.g., Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (invalidating claims because the scope of the claims was a "matter of subjective perception" and the patent offered "no objective way to discern the appropriate (sinusoidal or non-sinusoidal) line extending through the intonation portions of a nut for purposes of determining infringement"). Claims terms may also be indefinite "if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Further, functional claim terms may be indefinite. Even where a term lacks the word "means," the claim term may nevertheless be understood to be a means-plus-function term and § 112 applies if the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

The following terms render the Asserted Claims invalid for indefiniteness, lack of written description, and/or lack of full scope enablement:

| Claim Term | § 112 Challenge Ground | Exemplary Description |
|---|---|---|
| "bedtime associated with the user" (~~'339 Patent cls. 1, 5~~) | Indefinite; lack of ~~enablement~~ | A POSA would be unable to ascertain with reasonable certainty from the specification what is meant by the term "bedtime," including whether it refers to when a user lies |

| | | down, when ~~the user falls asleep, or some other event.~~ |

| Claim Term | § 112 Challenge Ground | Exemplary Description |
|---|---|---|
| ~~"biological signal" / "bio signal" ('461 Patent, cls. 1, 3)~~ | ~~Indefinite~~ | ~~A POSA would be unable to ascertain with reasonable certainty what qualifies as a "biological signal" as opposed to ordinary sensor data. The specification lists examples (e.g., heart rate, breathing rate, temperature) but provides no objective boundaries, signal characteristics, signal requirements, or exclusion criteria defining the scope of the term.~~ |
| ~~"detect a biological signal of a user" ('461 Patent, cl. 1)~~ | ~~Indefinite~~ | ~~A POSA would be unable to ascertain with reasonable certainty from the intrinsic record what it means to "detect" a biological signal of a user, including what level of accuracy, persistence, or signal quality is required, or how detection is distinguished from incidental sensing of ambient or residual conditions.~~ |
| ~~"environmental property"~~ (~~'~~240 Patent, cl~~s~~. 2, 5; '339 Patent~~,~~ cl~~s~~. ~~9~~. 1, 5) | ~~Indefinite~~enablement | ~~A POSA would be unable to ascertain with reasonable certainty what constitutes an "environmental property," as the term is undefined, and provides no guidance as to scope, measurement, or interaction with biological signals.~~the user falls asleep, or some other event. |

| | | |
|---|---|---|
| "environmental property of an environment proximate the user" ('240 Patent, cls. 2, 5; '339 Patent, cl. 9) | Indefinite | A POSA would be unable to ascertain with reasonable certainty what constitutes an "environmental property of an environment proximate the user," as the specification does not describe what constitutes "an environment proximate the user" or the boundaries |
| "compound biological signal comprising one or | Indefinite | A POSA would be unable to ascertain with reasonable certainty what constitutes a "compound biological |

| Claim Term | § 112 Challenge Ground | Exemplary Description |
|---|---|---|
| more" ('339 Patent, cl. 22) | | signal" since the claim specifies it may be only a single signal. |
| "filtering the compound biological signal to extract the at least one first biological signal" ('339 Patent, cl. 23) | Lack of enablement; lack of written description | The specification fails to disclose filtering parameters, frequency bands, or signal-processing techniques necessary to extract biological components from a compound signal. |
| "filtering" the biological signal ('240 Patent, cls. 3. 6) | Lack of enablement; lack of written description | The specification fails to disclose filtering parameters, frequency bands, or signal-processing techniques necessary to extract biological components from a compound signal. |
| "first biological signal" / "second biological signal" of different types ('461 Patent, cl. 3) | Indefinite; lack of written description | A POSA would be unable to ascertain with reasonable certainty what constitutes different "types" of biological signals or how such types are defined, classified, or distinguished. |
| "first temperature" / "second temperature" control device" | Indefinite; lack of enablement; | A POSA would be unable to ascertain determine with reasonable certainty what constitutes the claimed "first the full scope of "temperature" or |

DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

| | | |
|---|---|---|
| (‘339 Patent, cl. 1; ‘240 Patent, cl. 1) | lack of written description | "second temperature control device," as the specification distinguishing one from the other. The specification does not disclose whether the temperatures does not enable or describe the full scope of this claim term as it is apparently asserted according to Plaintiff's infringement contentions. data is measured sequentially or simultaneously. |
| "first zone" / "second zone" (‘240 Patent, cl. 1) | Indefinite | A POSA would be unable to ascertain with reasonable certainty what constitutes a "zone" of the bed device, as the specification provides no structural, dimensional, or functional boundaries distinguishing one zone from another. |

| Claim Term | § 112 Challenge Ground | Exemplary Description |
|---|---|---|
| "identify said user ... based on said biological signal" (‘461 Patent, cl. 1) | Indefinite, lack of enablement | A POSA unable to ascertain with reasonable certainty how the claimed processor performs "identification" based on biological signals, as the specification discloses no algorithm, logic, or structure for biometric identification. |
| "sleep phase" (‘240 Patent, cls. 14-15) | Indefinite; lack of enablement; lack of written description | A POSA would not have been able to determine with reasonable certainty how sleep phases are derived from the recited biological signals, as the specification lacks disclosure of any criteria for sleep-phase classification. |

| | | |
|---|---|---|
| ~~"sleep session" ('240 Patent, cls. 11-12)~~ | ~~Indefinite~~ | ~~A POSA would be unable to determine with reasonable certainty what constitutes a "sleep session," as the intrinsic record provides no objective criteria for when a session begins or ends.~~ |
| ~~"temperature control~~ "bed device" ('339 Patent, cl. 1; '240 Patent, cl. 1) | ~~Indefinite~~Lack of enablement; lack of ~~enablement~~written description | A POSA would be unable to determine the full scope of "~~temperature control~~bed device," as the specification does not ~~disclose any structure or mechanism corresponding to such a device, nor does it enable all devices that could fall within the claim term.~~enable or describe the full scope of this claim term as it is apparently asserted according to Plaintiff's infringement contentions |
| ~~"transmit" ('339 Patent, cl. 28)~~ | ~~Lack of enablement~~ | ~~The specification fails to describe the database, transmission protocol, data format, or system architecture by which the biological signal data is transmitted to said database.~~ |
| ~~"user-specified preference" ('240 Patent, cl. 1)~~ | ~~Indefinite; lack of written description~~ | ~~A POSA would be unable to ascertain with reasonable certainty what constitutes a "user-specified preference," as the specification does not describe the format, or method of determining or applying said preferences.~~ |

## III. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 101 AS DIRECTED TO PATENT INELIGIBLE SUBJECT MATTER

Every asserted claim is invalid as directed to patent ineligible subject matter under 35 U.S.C. § 101 for the reasons laid out in Defendants' Motion to Dismiss

(Dkt. No. 36), the full contents of which are incorporated by reference. In brief: at step one of the inquiry under *Alice v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014), the claims of both patents are directed to the abstract idea of collecting data, processing it to generate an instruction, and transmitting the instruction to a device; specifically, to automate heating a bed. At step two, there is no inventive concept because the claims recite only generic sensors, networks, and processors operating in conventional ways, as repeatedly confirmed by the specification. None of the dependent claims add anything of patentable significance. Each recites only well-known, routine, and conventional functions, and primarily represent only design choices from a set of known, conventional options.

Dated: ~~February 23~~April 9, 2026        Respectfully submitted,

~~COOLEY~~SIMPSON THACHER & BARTLETT LLP

By: /s/~~Eamonn Gardner~~ Amy H. Candido
~~Eamonn Gardner~~Amy H. Candido (CA SBN ~~310834~~237829)
amy.candido@stblaw.com
Jeff Nardinelli (SBN 295932)
jeff.nardinelli@stblaw.com
SIMPSON THACHER & BARTLETT ~~COOLEY~~ LLP
One Market Plaza
~~1144 15th Street~~Spear Tower, Suite ~~2300~~3800
~~Denver, CO 80202~~
San Francisco, CA 94105
Phone: (~~720~~415) ~~566-4000~~426-7300
Fax: (~~720~~415) ~~566-4099~~426-7301

Sanford L. Michelman (SBN 179702)
~~egardner@cooley~~smichelman@mrllp.com

52                    No. 2:26-cv-02460-SB-KS
DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

~~Alexandra Mayhugh (CA SBN 300446~~Aaron L. Plesset (SBN 352104)
aplesset@mrllp.com
~~COOLEY~~MICHELMAN & ROBINSON, LLP
~~355 South Grand Avenue, Suite 900~~
10880 Wilshire Blvd., 19th Floor
Los Angeles, CA ~~90071~~90024
Phone: (~~213~~310) ~~561-3250~~299-5500
Fax: (~~213~~310) ~~561-3244~~299-5600

~~amayhugh@cooley~~Mona Z. Hanna (SBN 131439) mhanna@mrllp.com
MICHELMAN & ROBINSON, LLP
17901 Von Karman Ave, 10th Floor

~~Megan L. Donohue (CA SBN 266147)~~
~~Vivienne A. Goldschlag (CA SBN 345611)~~
~~COOLEY LLP~~
~~10265 Science Center Drive~~
~~San Diego, CA 92121~~
~~Phone: (858) 550-6000~~

Irvine, California 92614
Phone: (714) 557-7990
Fax: (~~858~~714) ~~550-6420~~557-7991

~~mdonohue@cooley.com~~
~~vgoldschlag@cooley.com~~

*Counsel for Defendants*
*Orion Longevity Inc. and Blue Fuzion Group Ltd.*

**APPENDIX A**

| Short Name | Prior Art Reference(s) | Priority Date(s) | BATES Range |
|---|---|---|---|
| Bader | U.S. Patent Application Publication No. US 2006/0162074 A1 | February 4, 2003 | ORION_00000001-ORION_00000005 |
| Blumberg | U.S. Patent Application Publication No. US 2008/0052837 A1 | September 6, 2006 | ORION_00000006-ORION_00000016 |
| Chestakov | European Patent Publication No. EP2496996B1 | November 5, 2009 | ORION_00000017-ORION_00000037 |
| Guo | Guo, H. et al., "Ballistocardiogram-based person identification using correlation analysis," *World Congress on Medical Physics and Biomedical Engineering, IFMBE Proceedings 39*, pp. 570573 (2013) | No later than December 31, 2013 | ORION_00000038-ORION_00000041 |
| Inoue | Japanese Patent No. JP2009022565A | July 20, 2007 | Native ORION_00000042-ORION_00000056 Translated ORION_00000057-ORION_00000072 |
| Koninkl Philips | European Patent Publication No. EP2320292A1 | November 5, 2009 | ORION_00000073-ORION_00000083 |
| Larson | U.S. Patent No. 5,948,303 | May 4, 1998 | ORION_00000084-ORION_00000088 |

DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

| Matsunaka | Japanese Patent No. JPH05329038A | June 3, 1992 | Native ORION_00000089-ORION_00000094 Translated ORION_00000095-ORION_00000100 |
|---|---|---|---|

| Short Name | Prior Art Reference(s) | Priority Date(s) | BATES Range |
|---|---|---|---|
| Nemoto | Japanese Patent No. JP2014042773A | August 3, 2012 | Native ORION_00000101-ORION_00000128 Translated ORION_00000129-ORION_00000170 |
| Oexman | U.S. Patent Application Publication No. US 2011/0010014 A1 | February 25, 2008 | ORION_00000171-ORION_00000188 |
| Sato | Japanese Patent No. JP2003061918A | August 23, 2001 | Native ORION_00000189-ORION_00000197 Translated ORION_00000198-ORION_00000210 |
| Stern | U.S. Patent Application Publication No. US 2003/0234247 A1 | June 19, 2002 | ORION_00000211-ORION_00000225 |
| Van Driel | International Publication No. WO 2013/076628 A1 | November 21, 2011 | ORION_00000226-ORION_00000248 |
| Warner | U.S. Patent Application Publication No. US 2008/0126132 A1 | November 28, 2006 | ORION_00000249-ORION_00000262 |

DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

## APPENDIX B

| Exhibit No. | Prior Art Reference |
|---|---|
| A-1 | U.S. Patent No. 10,792,461 vs. U.S. Patent Application Publication No. US 2006/0162074 A1 ("Bader") |
| A-2 | U.S. Patent No. 10,792,461 vs. U.S. Patent Application Publication No. US 2008/0052837 A1 ("Blumberg") |
| A-3 | U.S. Patent No. 10,792,461 vs. Ballistocardiogram-based person identification using correlation analysis ("Guo") |
| A-4 | U.S. Patent No. 10,792,461 vs. Japanese Patent No. JP2009022565A ("Inoue") |
| A-5 | U.S. Patent No. 10,792,461 vs. Japanese Patent No. JP2014042773A ("Nemoto") |
| A-6 | U.S. Patent No. 10,792,461 vs. U.S. Patent Application Publication No. US 2011/0010014 A1 ("Oexman") |
| A-7 | U.S. Patent No. 10,792,461 vs. U.S. Patent Application Publication No. US 2003/0234247 A1 ("Stern") |
| A-8 | U.S. Patent No. 10,792,461 vs. International Publication No. WO 2013/076628 A1 ("Van Driel") |
| A-9 | U.S. Patent No. 10,792,461 vs. U.S. Patent Application Publication No. US 2008/0126132 A1 ("Warner") |
| B-1 | U.S. Patent No. 12,377,240 vs. U.S. Patent Application Publication No. US 2008/0052837 A1 ("Blumberg") |
| B-2 | U.S. Patent No. 12,377,240 vs. Japanese Patent No. JP2009022565A ("Inoue") |
| B-3 | U.S. Patent No. 12,377,240 vs. Japanese Patent No. JP2014042773A ("Nemoto") |
| B-4 | U.S. Patent No. 12,377,240 vs. Japanese Patent No. JP2003061918A ("Sato") |
| B-5 | U.S. Patent No. 12,377,240 vs. U.S. Patent Application Publication No. US 2003/0234247 A1 ("Stern") |
| B-6 | U.S. Patent No. 12,377,240 vs. U.S. Patent Application Publication No. US 2008/0126132 A1 ("Warner") |

| C-1 | U.S. Patent No. 12,370,339 vs. U.S. Patent Application Publication No. US 2006/0162074 A1 ("Bader") |
|---|---|
| C-2 | U.S. Patent No. 12,370,339 vs. European Patent Publication No. EP2496996B1 ("Chestakov") |
| C-3 | U.S. Patent No. 12,370,339 vs. Japanese Patent No. JP2009022565A ("Inoue") |

| C-4 | U.S. Patent No. 12,370,339 vs. European Patent Publication No. EP2320292A1 ("Koninkl Philips") |
|---|---|
| C-5 | U.S. Patent No. 12,370,339 vs. U.S. Patent No. 5,948,303 ("Larson") |
| C-6 | U.S. Patent No. 12,370,339 vs. Japanese Patent No. JPH05329038A ("Matsunaka") |
| C-7 | U.S. Patent No. 12,370,339 vs. Japanese Patent No. JP2014042773A ("Nemoto") |
| C-8 | U.S. Patent No. 12,370,339 vs. Japanese Patent No. JP2003061918A ("Sato") |
| C-9 | U.S. Patent No. 12,370,339 vs. U.S. Patent Application Publication No. US 2003/0234247 A1 ("Stern") |

## <u>PROOF OF SERVICE</u>

I am employed in the County of San ~~Diego~~Francisco, California. My business address is ~~Cooley LLP 10265 Science Center Drive, San Diego, CA 92121~~One Market Plaza, Spear Tower, Suite 3800. I am over the age of 18 and not a party to the foregoing action. ~~I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for electronic transmission, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.~~

On ~~February 23~~April 9, 2026, I caused a copy of the foregoing document to be served on the interested parties in this action by attaching a PDF version of the document to an email message addressed as follows:

x
**PERSONAL:**        Such envelope was delivered by hand to the offices of the
                     addressee.
**ELECTRONIC**    Such document was transmitted by electronic mail to the
**MAIL:**            addressees' email addresses as stated above.
**FEDERAL**         Such correspondence was deposited on the same day in
**EXPRESS:**        the ordinary course of business with a facility regularly
 maintained by Federal Express.

~~I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.~~ I declare under penalty of perjury that the above is true and correct. Executed on ~~February 23~~April 9, 2026, at San ~~Diego~~Francisco, California.

/s/ ~~*Erin McKenzie*~~*Jeff Nardinelli*
Jeff Nardinelli

DEFENDANTS' FIRST AMENDED INVALIDITY CONTENTIONS

| Summary report: Litera Compare for Word 11.12.0.83 Document comparison done on 4/12/2026 2:22:34 PM | |
|---|---|
| **Style name:** table | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\16514\OneDrive - stblaw.com\Desktop\new redline\2026-02-23 Orion-BFG Invalidity Contentions - Appxs A - B.docx | |
| **Modified filename:** C:\Users\16514\OneDrive - stblaw.com\Desktop\new redline\2026-04-09 First Amended Invalidity Contentions.docx | |
| **Changes:** | |
| Add | 131 |
| Delete | 194 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 3 |
| Table Delete | 48 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 376 |