UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EIGHT SLEEP INC., | Case No. 2:26-cv-02460-SB-KS |
| Plaintiff, |  |
| v. | ORDER GRANTING IN PART MOTION TO DISMISS [DKT. NO. 36] |
| ORION LONGEVITY INC. et al., |  |
| Defendants. |  |

Plaintiff Eight Sleep Inc. developed and patented the Eight Sleep Pod, a "bio-tracking mattress cover" that optimizes sleep by using biometric measurements to automatically adjust the temperature of the user's bed.  Defendant Orion Longevity Inc., working with Defendant Blue Fuzion Group (BFG), developed a competing temperature-regulating mattress cover with similar features.  Plaintiff alleges that Defendants infringed its patents and that Orion falsely advertised the allegedly infringing product.  Defendants move to dismiss the complaint.  Dkt. No. 36.  The Court held a hearing on May 1, 2026.  The motion to dismiss is granted as to Plaintiff's state claims and denied as to Plaintiff's claims under the Patent Act and Lanham Act.

I.

Over more than a decade, Plaintiff invested millions of dollars to develop and produce its Eight Sleep Pod, a "a bio-tracking sleep system that uses dynamic heating, cooling, and AI-driven temperature regulation to measurably improve sleep."  Dkt. No. 1 ¶ 2.  The Eight Sleep Pod consists of a temperature-regulated mattress cover and a separate base unit that uses software to track biological signals and adjust temperatures for each side of the bed.  *Id*. ¶¶ 30–31.  Unlike prior methods for regulating body temperature during sleep—e.g., "manipulating ambient temperature, warming the extremities, modifying clothing or bedding layers, using electric blankets, using a thermal suit during sleep, cooling the head,

1

or sleeping on a high heat capacity mattress"—the Eight Sleep Pod can
"individualize temperatures based on a user's unique physiology," including
gender, and can adjust the temperature on each side of the bed in response to the
user's sleep stage, heart rate, and respiratory rate. *Id.* ¶ 31.  The Eight Sleep Pod
has been recognized as innovative, including by being selected as one of TIME
Magazine's 100 best inventions. *Id.* ¶ 3.

Eight Sleep obtained two patents for its technology:  U.S. Patent Nos.
12,370,339 (the '339 Patent) and 12,377,240 (the '240 Patent).  Both patents have
identical specifications and describe "methods and systems for:  gathering human
biological signals, such as heart rate, breathing rate, or temperature; analyzing the
gathered human biological signals; and controlling home appliances based on the
analysis." Dkt. No. 1-1 at 28; Dkt. No. 1-2 at 28.  Claim 1 of the '339 Patent
claims:

A method for operating a bed device, the method comprising:

obtaining at least one first biological signal from a user, the at least
one first biological signal indicating a presence of the user on the
bed device;

determining a first control signal and a time to send the first control
signal to the bed device, wherein the first control signal comprises a
first instruction to turn the bed device on or off and a second
instruction to set a temperature of the bed device to a first
temperature, and wherein the time to send the first control signal to
the bed device is based on a bedtime associated with the user, the
presence of the user, or both;

sending the first control signal to the bed device at the determined
time to turn the bed device on or off and set the bed device to the
first temperature;

obtaining, while the bed device is turned on, at least one second
biological signal from the user, wherein the at least one second
biological signal is different from the at least one first biological
signal;

determining a second control signal, wherein the second control
signal comprises an instruction to the bed device to adjust the

2

> temperature of the bed device to a second temperature in response to the obtained at least one second biological signal; and

> sending the second control signal to the bed device to adjust the temperature of the bed device to the second temperature.

Dkt. No. 1 ¶ 65; Dkt. No. 1-1 at 37.

The '240 Patent applies the same technology to a bed with two separate zones, claiming in Claim 1:

> A method for operating a bed device, the method comprising:

> obtaining at least one first biological signal from a first user, the at least one first biological signal indicating a presence of the first user on a first zone of the bed device;

> obtaining at least one second biological signal from a second user, the at least one second biological signal indicating a presence of the second user on a second zone of the bed device adjacent the first zone;

> generating a plurality of control signals for the bed device in response to the obtained at least one first biological signal and the at least one second biological signal, the plurality of control signals comprising (1) a first instruction to set the temperature of the first zone to a first temperature and (2) a second instruction to set the temperature of the second zone to a second temperature that is different from the first temperature, wherein the first instruction is based at least in part on a first user-specified preference of the first user and the second instruction is based at least in part on a second user-specified preference of the second user; and

> sending the plurality of control signals to at least one respective temperature control device associated with the bed device such that the first and second zones are heated or cooled differently according to the plurality of control signals.

Dkt. No. 1 ¶ 82; Dkt. No. 1-2 at 75.

Orion developed the Orion Sleep System, a smart cover device with a control tower, that, like the Eight Sleep Pod, "analyzes your sleep patterns to maintain your ideal temperature all night" using "sensors and temperature-control components that monitor user inputs and intelligently adjust[] the bed's temperature to help maintain optimal sleep conditions."  Dkt. No. 1 ¶¶ 24, 34. Orion competes directly with the Eight Sleep Pod, and it posted on its website a side-by-side comparison of the parties' products and their features.  *Id*. ¶ 38. Plaintiff alleges that Orion copied Plaintiff's product and has engaged in extensive misrepresentations to customers about the two products.  *Id*. ¶¶ 5–7.  Plaintiff also alleges that BFG participated in Orion's misconduct by "provid[ing] product development, overseas manufacturing support, and importation and logistics for importing Orion's knock-off products into the United States."  *Id*. ¶ 8.

Eight Sleep originally sued Defendants in October 2025 in a separate action. *Eight Sleep Inc. v. Orion Longevity Inc.* (*Eight Sleep I*), Case No. 2:25-cv-09685-SB, Dkt. No. 1 (C.D. Cal. Oct. 9. 2025).  To avoid procedural complications from changed circumstances after that action's filing that affected jurisdiction, the Court dismissed the case without prejudice so that the parties could refile the action, on the understanding that Defendants would accept service to avoid delay and that the new case would proceed in accordance with the case management order issued in *Eight Sleep I*.  *Eight Sleep I*, Dkt. No. 63.  Consistent with that order, Eight Sleep filed the instant action a week later, asserting claims against both Defendants for patent infringement and against Orion for false advertising and unfair competition under California law and the Lanham Act.  Dkt. No. 1.  Defendants now move to dismiss.  Dkt. No. 36.

II.

As anticipated in *Eight Sleep I*, the parties agreed to conduct jurisdictional discovery as to BFG.  To avoid waiver, Defendants included in their motion a brief argument that the Court lacks personal jurisdiction over BFG, but they note their understanding that "the Court will hold the personal jurisdiction dispute in abeyance, or deny it without prejudice, until the parties conduct jurisdictional discovery and submit further briefing."  Dkt. No. 36 at 21 n.4.  Accordingly, the motion to dismiss BFG for lack of personal jurisdiction is denied without prejudice.  The parties shall complete their jurisdictional discovery by June 12, 2026.

4

III.

The remainder of the motion argues that the complaint should be dismissed on the merits for failure to state a claim.  To survive a Rule 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

IV.

Defendants move to dismiss all five claims in the complaint, arguing that: (1) the infringement claims in Counts 1 and 2 fail because the patents are invalid under 35 U.S.C. § 101; (2) Plaintiff's claims in Counts 3 and 4 under the California Unfair Competition Law (UCL) and False Advertising Law (FAL) fail for lack of statutory standing and because Plaintiff has an adequate remedy at law; and (3) Plaintiff fails to state a claim under the UCL, FAL, or Lanham Act.

A.

The Patent Act permits inventors to obtain patents for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  Implicitly excluded from § 101 are laws of nature, natural phenomena, and abstract ideas, which are not patentable.  *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  In *Alice*, the Supreme Court articulated its two-step framework for determining whether a claim falls outside § 101.  First, the reviewing court asks whether the claim is "directed to" a patent-ineligible concept such as an abstract idea.  *Id*. at 217.  If so, the court proceeds to the second step, considering whether the elements of each claim—both individually and as an ordered combination—transform its nature into a patent-eligible application.  *Id.*  A claim falls outside § 101 only if it fails at both steps.

1.

Defendants argue that Plaintiff's patents are invalid under § 101 because they claim "the concept of using a computer to operate a heating pad when someone is in bed."  Dkt. No. 36 at 1; *accord id.* ("It claims the idea of using a computer to automate heating a bed.");  *id*. at 4 (Claim 1 "automates what users have always done by hand:  after getting in bed, turn on a heating device and adjust

5

the temperature."); *id*. at 9 ("Taken in combination, the claim elements automate the familiar process of climbing into bed and using a heating device[.]").[1]

The Court disagrees.  Defendants' argument is premised on reducing the claimed invention to an automated heating blanket.  At a minimum, that characterization does not address the invention's ability to both heat and cool the bed—functionality a heating blanket lacks, whether automated or not.  Claim 1 is not limited to heating; it states that the bed device can "adjust the temperature of the bed device," and the specification focuses on an embodiment that—like both the Eight Sleep Pod and the Orion Sleep System—is "capable of heating or cooling the user's bed."  Dkt. No. 1-1 at 28, 37.  Claim construction has not yet occurred, and the parties have not addressed whether any of the claim limitations require cooling functionality.  In any event, on this record, it is not clear that the patent merely claims the automation of a heating blanket with no other functionality.  *Cf. ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774–75 (Fed. Cir. 2019) (finding patents invalid under § 101 where "the claims do nothing to improve how charging stations function; instead, the claims merely add generic networking capabilities to those charging stations and say 'apply it'").

Nor does the patents' specification identify the "problem" merely as requiring the user "to remember to manually turn on the blanket, and then manually turn it on," as Defendants argue.  Dkt. No. 36 at 9 (quoting Dkt. No. 1-1 at 28); *see ChargePoint*, 920 F.3d at 767 ("The 'directed to' inquiry may also involve looking to the specification to understand 'the problem facing the inventor' and, ultimately, what the patent describes as the invention.").  Rather, the specification describes modern scientific research into the separate phases of sleep and the physiological changes that occur during sleep and states that "supporting healthy sleep is relegated to the technology of the past," including electric blankets.  Dkt. No. 1-1 at 28.  Although it notes that electric blankets require the user to manually turn them on and off, it also states that "the electric blanket provides no additional functionality besides warming the bed."  *Id*.  Thus, Defendants have not shown at step one of the *Alice* framework that the claimed invention is directed to nothing more than the abstract idea of automatically

---

[1] Defendants contend that the '240 Patent "claims the same concept [as the '339 Patent] with one variation:  instead of one user, there are two, each occupying a separate 'zone' of the bed with independent temperature control."  Dkt. No. 36 at 1.  Because Defendants have not identified any distinct features of the two patents that alter the § 101 analysis, the Court considers both patents together.

turning on and off of an electric blanket.  On this record, at the pleading stage, Defendants have not shown entitlement to dismissal under § 101.

2.

Even if they could get past step one, Defendants have not shown entitlement to dismissal at step two, which asks whether the patent "contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) (quoting *Alice*, 573 U.S. at 221).  That inquiry turns on whether the claim limitations "involve more than performance of well-understood, routine, and conventional activities previously known to the industry."  *Id*. (cleaned up).  "Whether the claim elements or the claimed combination are well-understood, routine, [and] conventional is a question of fact."  *Id*. (finding that allegations raised fact disputes as to existence of inventive concept, precluding dismissal under § 101 at the Rule 12(b)(6) stage).

Again, Defendants contend that Plaintiff's technology merely automates the process of turning on a heating device, akin to "a caretaker taking a sleeping person's temperature (or heart rate, or respiration rate, etc.) and adjusting their electric blanket."  Dkt. No. 52 at 3.  Even if it was theoretically possible for a customer to hire a caretaker to physically measure her biological signals and adjust her electric blanket throughout the night while she sleeps, Defendants make no showing that such practices were routine in the industry or that being able to make adjustments during sleep without the need for a second person who remains awake is not an innovative improvement.  Moreover, the complaint alleges that prior methods of regulating body temperature, such as using electric blankets, "typically did not change temperatures to adjust for different phases of sleep, and could not individualize temperatures based on a user's unique physiology (including gender differences)—both of which are key features of the Eight Sleep Pod," which also includes functionality "to silently wake users using temperature control and vibrations, based on where the user is in his sleep cycle (as opposed to traditional alarms, which wake the user regardless of where he may be in his sleep cycle)."  Dkt. No. 1 ¶ 31.  The patents claim a device that repeatedly adjusts temperatures in response to both real time biological signals and environmental factors, including, in dependent claim, "historical measurements of the bedtime of the user."  Dkt. No. 1-1 at 37.  Defendants do not identify any other prior art in the field with similar functionality.

7

3.

Patents are presumed valid.  35 U.S.C. § 282(a).  Patent eligibility may be resolved at the pleading stage "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix*, 882 F.3d at 1125.  On this record, Defendants have not shown that Plaintiffs' patents should be found invalid at the pleading stage because they involve only "well-understood, routine, and conventional" activity already engaged in by researchers in the field. *Id.* at 1128.  Taking the allegations in the complaint as true, Plaintiff's invention was a "groundbreaking" product developed through a decade of research that allowed "significant improvements in deep sleep, cardiovascular recovery, and overall sleep quality" and was heralded in the field as a noteworthy invention.  Dkt. No. 1 ¶¶ 2, 33.  At the pleading stage, Defendants have not shown that they are entitled to dismissal of the patent claims for subject-matter ineligibility based on their oversimplified characterization of the invention as an automated heating blanket.[2]

B.

Counts 3 and 4 allege that Orion made false and misleading statements about the Orion Sleep System's features and availability, including by representing, during development, capabilities not borne out in the product released to the market, in violation of the UCL and FAL.  *Id*. ¶¶ 95–108.  Orion challenges the UCL and FAL claims for lack of statutory standing.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The FAL similarly prohibits making or disseminating "untrue or misleading" statements to advertise goods or services. *Id.* § 17500.  The statutes "protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) (quoting *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320 (2011)).  Both statutes "require[] that a plaintiff have 'lost

---

[2] The Court need not reach the parties' dispute whether Defendants waived their invalidity defense by failing to timely disclose invalidity contentions.  The parties have separately stipulated to file amended invalidity contentions.  Dkt. No. 65; *see also* Dkt. No. 67 at 9:17–19 (Defendants' statement at the May 1 hearing that "the waiver issue is off the table, according to the agreement from the parties, subject to [the] Court's approval").

money or property' to have standing to sue," which requires the plaintiff to "demonstrate some form of economic injury." *Kwikset*, 51 Cal. 4th at 323. The economic injury must also be "'as a result of' the unfair competition or a violation of the false advertising law," which requires the plaintiff to show "a causal connection or reliance on the alleged misrepresentation." *Id.* at 326; *see Key v. Qualcomm Inc.*, 129 F.4th 1129, 1141 (9th Cir. 2025) ("[T]he California Supreme Court has repeatedly reaffirmed that 'reliance is the causal mechanism of fraud.'") (quoting *Kwikset*, 51 Cal. 4th at 326).

Plaintiff relies on the Ninth Circuit's decision in *TrafficSchool.com*, which stated that the court has "generally presumed commercial injury" when the parties "are direct competitors and [the] defendant's misrepresentation has a tendency to mislead consumers." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011). That decision, however, addressed the Lanham Act, which requires only *likely* injury. *Id.* ("Because a likely injury is far less certain than an actual injury, plaintiffs need not prove the latter to establish the commercial injury necessary for Lanham Act standing."). It does not relieve Plaintiff of its obligation under the UCL and FAL to allege actual monetary loss as a result of the misrepresentations.

The complaint conclusorily alleges that as a result of Orion's false advertising, Eight Sleep's goodwill was damaged, and it "lost sales because customers who would have otherwise purchased its products, instead purchased Orion." Dkt. No. 1 ¶ 100. This allegation is insufficient to establish economic injury caused by reliance on Orion's misrepresentations as required for statutory standing under the UCL and FAL. First, the law is unsettled as to whether injury derived from a customer's reliance on fraudulent advertisements may support a false-advertising claim by a competitor who did not rely on the fraud. Historically, a majority of district courts required reliance by the competitor-plaintiff to support statutory standing, while "a growing number of district courts [are] holding that a competitor plaintiff can have standing under the UCL and FAL without alleging its own reliance, as long as the plaintiff has alleged a sufficient causal connection." *KT Enters. LLC v. Comp360, LLC*, 751 F. Supp. 3d 999, 1003 (C.D. Cal. 2023) (cleaned up) (collecting cases). It is unnecessary to pick a side, however, because even under the more permissive approach, Plaintiff has not sufficiently alleged monetary loss or causation. The complaint does not identify any specific lost sales attributable to customers' viewing any of the allegedly false advertisements, and its conclusory allegations that it lost sales are insufficient under the UCL and FAL to establish an actual loss of money caused by customers' reliance on the alleged false advertising. *See Kachuck Enters. v. Mission Produce, Inc.*, No. 2:25-CV-

01523-AH, 2026 WL 216475, at *6 (C.D. Cal. Jan. 22, 2026) (dismissing UCL and FAL claims for lack of statutory standing where "Plaintiffs do not offer any examples of consumers who have actually seen and relied on the alleged misrepresentations, or any other facts or allegations supporting their generalized assertions regarding consumer reliance").

The complaint also conclusorily alleges that Orion "repeatedly approached investors with false claims" about the parties' products and Eight Sleep's profits and margins, and that Plaintiff "lost investment opportunities that would otherwise have been available from investors who would have, but for Orion's false statements to investors, invested in Eight Sleep." Dkt. No. 1 ¶¶ 7, 100. Unlike the alleged false advertising to customers, the complaint does not identify any specific misrepresentations made to investors, falling short of the specificity required by Rule 9(b). Nor is it clear that statements to investors are actionable as advertisements under the UCL and FAL. *Cf. RPost Holdings, Inc. v. Trustifi Corp.*, No. 10-CV-1416-PSG, 2012 WL 12952728, at *7 (C.D. Cal. May 11, 2012) (finding statements to potential investors not actionable as false advertising under the Lanham Act because they were neither "made for the purpose of influencing consumers to buy defendant's goods or services" nor "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion'") (cleaned up). In any event, the complaint does not identify any specific actual losses as a result of Orion's discussions with investors.

Because the complaint does not contain any nonconclusory allegations identifying actual losses resulting from anyone's reliance on Orion's alleged misrepresentations, and the Lanham Act's presumption of injury does not apply to claims under the UCL and FAL, the UCL and FAL claims are dismissed for lack of statutory standing.[3]

C.

To assert a false-advertising claim under the Lanham Act, 15 U.S.C. § 1125, the plaintiff must show (1) "an injury to a commercial interest in reputation or sales" and (2) "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–33 (2014). When a plaintiff "competes

---

[3] It is therefore unnecessary to address Defendants' arguments about the availability of legal remedies or the existence of a misrepresentation in connection with the UCL and FAL claims.

10

directly with [the] defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing." *TrafficSchool.com*, 653 F.3d at 827; *see also Lexmark*, 572 U.S. at 137 (noting that "the classic Lanham Act false-advertising claim" is one in which "one competitor directly injures another by making false statements about his own goods or the competitor's goods and thus inducing customers to switch") (cleaned up).  Moreover, the Lanham Act permits false-advertising claims from "any person who believes that he or she is or is *likely* to be damaged."  15 U.S.C. § 1125(a)(1).  "Because a likely injury is far less certain than an actual injury, plaintiffs need not prove the latter to establish the commercial injury necessary for Lanham Act standing" and obtain injunctive relief.  *TrafficSchool.com*, 653 F.3d at 826.  To recover damages, however, the plaintiff must ultimately prove injury and causation.  *Id*. at 829, 831 (affirming district court's trial determination that defendants violated Lanham Act but that plaintiffs had not shown entitlement to damages).

Orion argues that Plaintiff's Lanham Act claim fails to state a claim because the complaint does not identify any false statements that proximately caused harm to Plaintiff.  The complaint identifies numerous statements on which the false-advertising claims are predicated.  Some of those statements may be inadequate to support a claim of misrepresentation, but the Court finds at least one false statement plausibly alleged.  In October 2025, Orion posted on its website a chart purporting to compare the features offered by "Eight Sleep" and "Orion," suggesting that Orion offered all 10 of the features listed while Plaintiff offered only one (embedded sleep sensors).  Dkt. No. 1 ¶¶ 38, 45.  One of the features identified for Orion's product was "5-Stage sleep tracker," which the complaint alleges "never existed."  *Id*. ¶¶ 38, 47.  Plaintiff alleges that the statement "was false when made, and was designed to induce customers to select Orion over Eight Sleep based on non-existent functionality," and that even though Orion later "removed this non-existent feature from its product comparison," the false statement was "likely to influence a consumer's purchasing decision, and did in fact influence purchasing decisions before the statement was removed."  *Id*. ¶ 47.  The false statement was posted on Orion's during "some of the busiest shopping dates in the United States, including Black Friday."  *Id*.

Defendants have not shown that these allegations are inadequate to support a claim under the Lanham Act at the pleading stage.  Taking as true the allegation that the "5-Stage sleep tracker" is a feature that never existed, Plaintiff has plausibly alleged that Orion knew its representation that its products (unlike Plaintiff's) included that feature was false.  Moreover, Plaintiff has alleged that the publication of the false comparison between Orion's and Eight Sleep's products

11

during the busiest shopping season of the year influenced customer decisions and caused injury to Plaintiff. *Id.*; *see also id.* ¶ 100 ("Eight Sleep lost sales because customers who would have otherwise purchased its products, instead purchased Orion."); *id.* ¶ 105 (incorporating ¶ 100 into Lanham Act claim). Unlike in the UCL and FAL context, the fact that Plaintiff's allegations of harm are largely conclusory does not preclude standing under the Lanham Act, which presumes injury from false advertisements in claims against direct competitors. *TrafficSchool.com*, 653 F.3d at 827. Thus, Defendants have not shown that Plaintiff's failure to identify a specific lost sale makes its allegations inadequate for Lanham Act standing at the pleading stage, particularly where the alleged misrepresentation was in a chart directly comparing the parties' products. *See Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, No. 20-CV-5486-DSF, 2020 WL 8768056, at *5 (C.D. Cal. Nov. 9, 2020) (rejecting argument that plaintiff "must identify a specific lost sale to adequately plead that it has suffered an injury").

Moreover, the causal chain from Orion's false side-by-side comparison of the parties' products to the presumed commercial harm is not "too remote." *Lexmark*, 572 U.S. at 133. As alleged, consumers who otherwise would have purchased Plaintiff's products have instead purchased Orion's products because of its misrepresentations. In explaining the requirement of proximate cause, the Supreme Court in *Lexmark* identified the "diversion of sales to a direct competitor" as "the paradigmatic direct injury from false advertising." *Id*. at 138. Plaintiff's allegations, while conclusory, are adequate to plausibly allege that the presumed commercial harm it suffered was directly caused by Orion's false statements comparing their products. *See Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 645 (N.D. Cal. 2019) (finding similar allegations sufficient); *accord Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 830 (N.D. Cal. 2019); *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, No. 16-CV-00253, 2016 WL 6393503, at *5 (N.D. Cal. Oct. 28, 2016).[4] Of course, whether those allegations

---

[4] *But see Botanic Tonics, LLC v. Shot of Joy, LLC*, No. 2:23-CV-10437-WLH, 2024 WL 2209773, at *4 (C.D. Cal. Apr. 1, 2024) (finding conclusory allegations of "lost sales and profits" inadequate to show causation under Lanham Act where the defendant misrepresented its own product's characteristics). *Botanic* is factually distinguishable because it did not involve a statement directly comparing the parties' products, which provides stronger support for an inference of causation. *Eli Lilly*, the other case on which Defendants rely, is even further afield. *See Eli Lilly & Co. v. Willow Health Servs., Inc.*, No. 2:25-CV-03570-AB, 2026 WL 639976, at *7 (C.D. Cal. Feb. 3, 2026) (finding no proximate causation where

12

are borne out by the evidence remains to be seen; the Court merely finds them plausible at the pleading stage.

Because Defendants have not shown that Plaintiff has failed to state a claim under the Lanham Act based on the alleged misrepresentation about the "5-Stage sleep tracker," the Court need not consider the viability of the other alleged misrepresentations.  *See Franklin v. Midwest Recovery Sys., LLC*, No. 8:18-CV-02085-JLS, 2020 WL 3213676, at *1 (C.D. Cal. Mar. 9, 2020) (explaining that Rule 12(b)(6) "does not provide a mechanism for dismissing only a portion of a claim") (collecting cases).  Accordingly, the motion is denied as to Plaintiff's Lanham Act claim.

## V.

Plaintiff requests leave to amend in the event any part of Defendants' motion is granted.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave may be denied, however, for reasons such as "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Although the complaint in this action is effectively an amendment of the pleading in *Eight Sleep I*, Defendants have not shown that further amendment would be futile or that leave should otherwise be disallowed.  Accordingly, Plaintiff's request for leave to amend is granted.

## VI.

Defendant's motion to dismiss is granted in part, and Plaintiff's UCL and FAL claims are dismissed for failure to state a claim with leave to amend.  The motion is otherwise denied.  No later than May 15, 2026, Plaintiff shall file its First Amended Complaint (FAC).  If Plaintiff continues to assert its patent infringement claims against BFG, the Court expects the FAC to identify the infringing acts by BFG on which the claims are based.  Plaintiff is cautioned that if Defendants move to dismiss the FAC for failure to state a claim, the Court does not expect to grant further leave to amend to add allegations that could have been included in the

---

"regardless of advertising or patient intent, obtaining a prescription medication requires a physician to prescribe it," such that "[t]he physician's prescribing decision, not [the defendant's] advertisements, is the proximate cause of the patient using the compounded medication instead of [the plaintiff's] product").

FAC.  Defendants shall answer or otherwise respond to the FAC no later than May 29, 2026.


Date: May 4, 2026                                    _____
                                                          Stanley Blumenfeld, Jr.
                                                       United States District Judge

14