Amy H. Candido (SBN 237829)
amy.candido@stblaw.com
Jeff Nardinelli (SBN 295932)
jeff.nardinelli@stblaw.com
**SIMPSON THACHER & BARTLETT LLP**
One Market Plaza
Spear Tower, Suite 3800
San Francisco, CA  94105
Phone: (415) 426-7300
Fax: (415) 426-7301

Sanford L. Michelman (SBN 179702)
smichelman@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Blvd., 19th Floor
Los Angeles, CA 90024
Phone: (310) 299-5500
Fax: (310) 299-5600

*Counsel for Defendants Orion Longevity Inc.
and Blue Fuzion Group Ltd.*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| EIGHT SLEEP INC., | Case No. 2:26-cv-02460-SB-KS |
| Plaintiff, | **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | Hon. Stanley Blumenfeld, Jr. |
| ORION LONGEVITY INC., and BLUE FUZION GROUP LTD. | Date: July 10, 2026 |
| Defendants. | Time: 8:30 a.m. |
| | Courtroom: 6C |

## **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   OVERVIEW OF THE PATENTS ....................................................................... 3

      A.    Agreed Construction .................................................................................. 4

      B.    Disputed Terms .......................................................................................... 4

            i.    "Bed Device" ..................................................................................... 5

            ii.   "Temperature Control Device" ......................................................... 9

            iii.  Claim 29 of the '240 Patent ............................................................ 12

            iv.   "A Processor / The Processor" ........................................................ 20

IV.   CONCLUSION .................................................................................................. 23

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ...................................................................8

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) .................................................................18

*Bandspeed LLC v. Realtek Semiconductor Corp.*,
2023 WL 11915723 (W.D. Tex. Aug. 11, 2023) ..........................................9

*Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010) .................................................................11

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*,
206 F.3d 1440 (Fed. Cir. 2000) ...........................................................10, 22

*Convolve, Inc. v. Compaq Computer Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) .......................................................20, 21, 22

*Curtiss-Wright Flow Control Corp. v. Z & J Techs. GmbH*,
563 F. Supp. 2d 1109 (C.D. Cal. 2007) ....................................................11

*D Three Enters., LLC v. SunModo Corp.*,
890 F.3d 1042 (Fed. Cir. 2018) .................................................................23

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .................................................................20

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ..............................................................8, 10

*Finjan, Inc. v. Sonicwall, Inc.*,
2019 WL 1369938 (N.D. Cal. Mar. 26, 2019) .............................................8

*General American Transp. Corp. v. Cryo-Trans, Inc.*,
93 F.3d 766 (Fed. Cir. 1996) .....................................................................12

*Gramm v. Deere & Co.*,
169 F.4th 1353 (Fed. Cir. 2026) .....................................................16, 17, 18

*Haptic, Inc. v. Apple, Inc.*,
2025 WL 82305 (N.D. Cal. Jan. 13, 2025).................................................6

*In re Cygnus Telecommunications Tech., LLC, Patent Litig.*,
481 F. Supp. 2d 1029 (N.D. Cal. 2007)......................................................16

*In re McFadden*,
2025 WL 2553720 (Fed. Cir. Sept. 5, 2025) ..............................................16

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016) .................................................................22

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) ....................................................................20, 21

*Knowles Elecs. LLC v. Cirrus Logic, Inc.*,
883 F.3d 1358 (Fed. Cir. 2018) ............................................................................23

*NobelBiz, Inc. v. Global Connect, LLC*,
701 F.App'x 994 (Fed. Cir. 2017) ..........................................................................8

*Novartis Pharms. Corp. v. Accord Healthcare, Inc.*,
38 F.4th 1013 (Fed. Cir. 2022) ...............................................................................8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .........................................................................2, 9

*Parity Networks, LLC ZyXEL Commc'ns, Inc. Parity Networks, LLC Moxa
Inc. Parity Networks, LLC v. Edgecore USA Corp.*,
2020 WL 8569299 (C.D. Cal. Dec. 22, 2020).......................................................17

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..............................................................................7

*Salazar v. AT&T Mobility LLC*,
64 F.4th 1311 (Fed. Cir. 2023) .............................................................................22

*Schoenhaus v. Genesco, Inc.*,
440 F.3d 1354 (Fed. Cir. 2006) ............................................................................11

*Simpson Strong-Tie Company, Inc. v. Oz-Post Int'l, LLC*,
373 F. Supp. 3d 1288 (N.D. Cal. 2019).................................................................10

*Syneron Medical Ltd. v. Invasix, Inc.*,
2018 WL 4696971 (C.D. Cal. Sept. 5, 2018) .......................................................17

*Texas Instruments Inc. v. U.S. Int'l. Trade Commn.*,
988 F.2d 1165 (Fed. Cir. 1993) ............................................................................11

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
728 F.3d 1309 (Fed. Cir. 2013) ..............................................................................8

*Vasudevan Software, Inc. v. MicroStrategy Inc.*,
2013 WL 5288267, (N.D. Cal. Sept. 19, 2013).....................................................11

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ...........................................................................5, 6

*Wang Labs., Inc. v. Am. Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999) ..............................................................................8

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) .............................................................16, 17, 18

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ...................................................................18, 20

iv                              No. 2:26-cv-02460-SB-KS

*X One, Inc. v. Uber Techs., Inc.*,
440 F. Supp. 3d 1019 (N.D. Cal. 2020)............................................................22

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## I.    INTRODUCTION

Eight Sleep is in a tough predicament.  It wrote its patents in 2015 in connection with its original product—a simple mattress cover priced under $200. That "Luna" product could heat the bed using embedded electrical coils, but could not cool the bed.  Indeed, as of September 2015, months after it wrote its patents, Eight Sleep admitted its product "doesn't cool your bed":

▽ Can Luna cool my bed?

No, it doesn't cool your bed but if you have a smart thermostat (e.g. Nest, Honeywell, etc) and you integrate it with Luna, Luna can communicate with it and let it optimize the temperature of your bedroom to help you sleep in a cooler environment.

https://web.archive.org/web/20150914040739/http://lunasleep.com/faq/

Eight Sleep's First Amended Complaint (Dkt. 71, "FAC") ignores its first "Luna" product.  Instead, Eight Sleep misleadingly suggests that its 2015 patents reflect its current "Pod" products, which allegedly incorporate "ten years" and "millions of dollars in research and development."  FAC ¶¶ 2, 31.  Of course, given that "Eight Sleep was founded in 2014," *id.* ¶ 2, its 2015 patents did not reflect "ten years" of research.  Eight Sleep knows this.  That is why its artfully worded FAC accuses Orion of copying its ***product*** rather than its ***patents***.  *Id.* ¶ 5.

But this is a patent infringement case, not a "product copying" case, and Eight Sleep must confront the vast gulf between its patented electrical-coil mattress pad and the accused Orion product, which uses a separate water tank to heat and cool water and to pump the water into tubing inside a mattress cover.

Instead of confronting this gap, Eight Sleep hides under the guise of "plain and ordinary meaning."  But "plain and ordinary meaning" is inadequate here because the parties sharply dispute the meaning of each disputed claim term.  "When the parties present a fundamental dispute regarding the scope of a claim term, it is the

court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008).  The Federal Circuit has instructed that "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate … when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.  Such is the case where, as here, instructing the jury that the disputed terms have their "plain and ordinary meaning" would simply leave the parties and their experts to argue the disputed claim scope to the jury.  *Id.* at 1362 (finding error when the district court "failed to adjudicate the parties' dispute" and let the jury consider expert testimony and "arguments regarding the meaning and legal significance" of the disputed term).

Confronted with an intrinsic record that discloses a simple bed-warming device—one that heats through electric coils but cannot cool—Eight Sleep asks this Court to accept "plain and ordinary meaning," hoping it can confuse a jury with product copying arguments, while handwaving over the critical differences with its patents.  That is not claim construction; it is claim avoidance.

The avoidance starts with the seemingly simple term "bed device."  The '339 and '240 patents clearly portray the "bed device" as a device the user sleeps on—such as a mattress or a mattress pad.  Orion admits its mattress cover is a device the user sleeps on and thus, a "bed device" as properly construed.  However, in order to make the accused Orion products fit the 2015 patents, Eight Sleep contends that the "bed device" in Orion's products encompasses not only the mattress cover, but also the water tank next to the bed, the computer server and software that lives in the cloud, the mobile application on the user's phone, and a separate "patch" that a user may optionally wear for a one-time sleep test.  In other words, Eight Sleep now contends that "bed device" refers to the entire Orion Sleep System, not just the physical product that the user sleeps on.  But the patents repeatedly differentiate between the "sleep system" or "system" and the "bed device," which is the part of

the system that the user sleeps on. Construction of "bed device" is critical to resolving the parties' disputes regarding the fundamental differences between the patent claims and Orion's products.

Based on Eight Sleep's contentions regarding the scope of "bed device," Eight Sleep's proposed "bed device" would also include the "temperature control device" in the '240 patent. Indeed, in its infringement contentions, Eight Sleep contends that Orion's "temperature control device" is the separate water tank next to the bed that heats and cools the water that is pumped into the mattress cover, which Eight Sleep included within the scope of the "bed device." Eight Sleep is wrong on both points— the "temperature control device" is not part of the "bed device" (as discussed above) and it is not a separate water tank. To the extent the '240 patent describes any "temperature control device"—which is debatable, as the phrase does not appear anywhere in the specification or figures—it definitely does not refer to a separate water tank as there is no mention of any water or tanks anywhere in the '240 patent. Instead, as taught in the '240 patent, the only "temperature control device" could be a power box that supplies power to the heating coils to make them hot. Thus, "temperature control device" must be construed accordingly.

Claim 29 is articulated in entirely functional language and is therefore a means-plus-function claim that must be limited to the specific structures actually disclosed. In addition, in claim 29, which first recites "a processor" but then refers back to it as "the processor," both phrases must be construed to refer to a single processor that performs each of the claimed functions.

## II.    OVERVIEW OF THE PATENTS

The two patents-in-suit, U.S. Patent Nos. 12,377,240 (the "'240 patent") and U.S. Patent No. 12,370,339 (the "'339 patent"), were both filed on January 15, 2025 and share a common specification. Both patents are continuations several times removed from U.S. Patent Application No. 14/732,624, filed June 5, 2015. That

means that the shared specification of the patents is identical to the specification filed on June 5, 2015, and contains no new teachings since that date. *See* Manual of Patent Examining Procedure §201.07 (a "continuation must not include any subject matter which would constitute new matter").

Both patents "claim a device that repeatedly adjusts temperatures in response to both real time biological signals and environmental factors." Dkt. 69 at 7. In '339 patent claim 1, the "control signals" that regulate temperature are sent to the "bed device"; whereas, in '240 patent claim 1, the "control signals" that regulate temperature are sent to a "temperature control device associated with the bed device." The '240 patent also claims dual-zone temperature control, which the '339 patent does not.

## III.   ARGUMENT

### A.   Agreed Construction

The parties have agreed that the term "sleep phase" ('240 patent, claims 14, 15) means "light sleep, deep sleep, or REM sleep."

### B.   Disputed Terms

The parties dispute:  (i) "bed device" in both patents; (ii) "temperature control device" in '240 patent claim 1; (iii) whether '240 patent claim 29 is a means-plus-function claim subject to 35 U.S.C. §112(f); and (iv) whether "the processor" as used in claim 29 of both patents refers to a single processor or includes multiple processors.  The intrinsic evidence and governing law support Defendants' position on all of the disputed terms.

### i.    **"Bed Device"**

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "bed device" ('339 patent, claims 1, 4, 28; '240 patent, claims 1, 8, 9, 10) | Plain and ordinary meaning | "device the user sleeps on" |

Independent claim 1 of both patents recites a "method for operating a bed device," including setting a temperature of the "bed device." Independent claim 29 of both patents recites a "sleep system … to implement the method of claim 1." The claim language itself, the relevant dependent claims, and the detailed description and figures in the specification are clear that the bed device is the device the user sleeps on, such as a mattress or mattress cover.

The claim language alone shows that the bed device is the device the user sleeps on. "First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim 1 of the '339 patent recites detecting "a presence of the user on the bed device." Likewise, claim 1 of the dual-zone '240 patent recites detecting "a presence of the first user on a first zone of the bed device" and "a presence of the second user on a second zone of the bed device adjacent the first zone." Dependent claim 4 of the '339 patent and claim 10 of the '240 patent also confirm that the "bed device" is the "device the user sleeps on," as they recite that "the bed device is a mattress or a mattress cover." Thus, the claims clearly require the bed device to be the device that the user(s) are "on" during use, consistent with Defendants' construction.

Every reference in the specification—"the single best guide to the meaning of a disputed term"—confirms the bed device is the device the user sleeps on. *See, e.g.*,

*Haptic, Inc. v. Apple, Inc.*, 2025 WL 82305, at *6 (N.D. Cal. Jan. 13, 2025) (quoting *Vitronics*, 90 F.3d at 1582 (Fed. Cir. 1996)).  For example, the patents explain that "[a] user sensor 210, associated with a ***mattress 200 of the bed device 120***, monitors bio signals associated with a ***user sleeping on the mattress 200***."  '240 patent at 5:16-19.[1]  Similarly, the specification teaches detecting that "the ***user is present in bed***."  *Id.* at 5:31-32.  None of these descriptions makes any sense if the bed device is not the device the user sleeps on.

The figures provide further overwhelming evidence that the bed device is the device the user sleeps on.  The bed device includes other hardware to drive functionality, such as sensors, a computer processor, and heating coils, but fundamentally it is the device the user sleeps on, such as a mattress or mattress cover. *See, e.g.*, '240 patent, Fig. 1 ("bed device" depicted as a "smart bed" connected to a "processor" that receives inputs from sensors); *id.*, Fig. 2 and 5:15-19 (showing "an example of the bed device … with a user sleeping on the mattress," *id.* ); *id.*, Fig. 3 and 6:16-23 (depicting "an example of the layers comprising the bed pad device," with layer 320 comprising the electrical coils).



FIG. 1          FIG. 2          FIG. 3

As previewed above, construction of "bed device" as the device that the user sleeps on is necessary because of Eight Sleep's infringement contentions.  Rather

---

[1] Because the two patents share an identical specification, Defendants cite to the '240 patent only.  But all cited disclosures appear at the same column(s) and line(s) in both patents.  Bold and italics are used for added emphasis throughout.

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

than simply map "bed device" to the mattress cover portion of the Orion Sleep System, Eight Sleep identifies the accused "bed device" as the following combination:

> Orion performs the claimed method of operating a bed device. Orion's website states that Orion's Sleep System comprises a Smart Cover, a Control Tower and Orion Intelligence, which is implemented by at least Orion's backend servers and is used in conjunction with the Orion mobile application that is available to users, as well as Orion's Sleep Optimization Test patch.

Ex. 1 at 1; Ex. 2 at 1 (identical language); Ex. 3 at 2 ("Eight Sleep very clearly identifies the accused 'bed device' at page 1 of both Exhibits 1 and 2 to its contentions."). Thus, Eight Sleep contends that Orion's "bed device" is a combination of a mattress cover (Smart Cover), a separate water tank next to the bed (Control Tower), software functionality in the cloud (Orion Intelligence), computer servers that live in the cloud, a mobile phone application, and a separate "patch" that the user can wear for one use to gather biological data.

Eight Sleep's contention illustrates the absurdity in permitting Eight Sleep to argue "plain meaning" to the jury; Eight Sleep is attempting to hide behind "plain meaning" so that it can tell the jury the "bed device" is just the device. But, by that, Eight Sleep means the entire Orion Sleep System, including a mattress cover *and* a tank *and* a server *and* software *and* a phone app *and* a patch. But no person of ordinary skill would understand "bed device" to encompass all of these components. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc) ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent.").

Moreover, consistent with Defendants' proposed construction, the specification discloses *only* one mechanism for directly controlling the temperature of the bed device: by supplying power to an electrical "heating coil" embedded into a layer of the bed device. *See* '339 patent at 2:60-61, 6:58-7:47. That disclosure underscores that the "bed device" refers to the structure the user sleeps on, not off-

7                                          No. 2:26-cv-02460-SB-KS

bed hardware like external tanks, servers, or phone applications. It similarly precludes Eight Sleep from accusing any "bed device" that uses a different mechanism, such as Orion's water-based system; indeed, a construction further limiting "bed device" to a device that uses electrical coils would be appropriate. *See, e.g.*, *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) (claims should not be "construed to have a meaning or scope that would lead to their invalidity for failure to satisfy the requirements of patentability").[2]

The jury (and this Court, at summary judgment) needs to know what the "bed device" is to evaluate infringement and invalidity. "Plain and ordinary meaning" is inappropriate here because it does not provide the clarity necessary to establish guardrails over this case and does not resolve the parties' obvious dispute regarding "bed device." *Finjan, Inc. v. Qualys Inc.*, 2020 WL 3101040, at *6 n.6 (finding plain and ordinary meaning appropriate only when "a single 'ordinary' meaning exists and fully resolves the parties' disputes"); *accord, e.g.*, *NobelBiz, Inc. v. Global Connect, LLC*, 701 F.App'x 994, 997 (Fed. Cir. 2017) (finding plain and ordinary meaning inadequate where the parties "disputed the *scope* that should be encompassed by th[e] claim language"); *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error to give claim terms their plain and ordinary meaning and "leave it for the jury to decide"); *Finjan, Inc. v. Sonicwall, Inc.*, 2019 WL 1369938, at *16 (N.D. Cal. Mar. 26, 2019) ("Finjan's proposal that 'instantiating

---

[2] Indeed, because the patents' shared specification does not disclose using an external water tank to heat or cool the bed device, to the extent the patent claims are construed to cover the water-based temperature regulation system used by Orion, the patents are invalid for failing to satisfy the requirements of 35 U.S.C. §112. *See, e.g., Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (to satisfy §112, a patent's specification must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date") (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)) (en banc). "The written description requirement prevents patentees from claiming more than they have actually invented and disclosed to the public, as measured by the written description of the invention provided with their patent applications." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1319 (Fed. Cir. 2013).

a scanner' has a plain and ordinary meaning will not aid the jury."); *Bandspeed LLC v. Realtek Semiconductor Corp.*, 2023 WL 11915723, at \*7 (W.D. Tex. Aug. 11, 2023) (rejecting "plain and ordinary meaning" where "additional clarity may aid a jury in better comprehending the term").

### ii.    "Temperature Control Device"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "temperature control device" ('240 patent, claim 1) | Plain and ordinary meaning | "device separate from the bed device that controls the temperature of the bed device" |

The "temperature control device" recited in '240 patent claim 1 is a distinct device from the "bed device" that controls the temperature of the bed device. Although the temperature control device may be closely integrated with the bed device, the user does not sleep on the temperature control device, and the temperature control device is never split into two separate "zones" corresponding to two separate sleepers (unlike the bed device). Eight Sleep argues that construction of "temperature control device" is unnecessary and it should be given its plain and ordinary meaning. But, Eight Sleep is wrong because the parties have a fundamental dispute regarding the scope of this claim term. Eight Sleep's infringement contentions reveal that Eight Sleep will argue to the jury that Orion's "temperature control device" (which Eight Sleep identifies as the separate water tank next to the bed) is part of Orion's "bed device" (which Eight Sleep says includes the mattress pad, the water tank, the user's phone, remote servers and other components). *Compare* Ex. 1 at 19 with *id.* at 1. Construction is required because the parties dispute this important issue and disputes over claim scope cannot be punted to the jury. *See, e.g.*, *O2 Micro*, 521 F.3d at 1362 ("plain and ordinary meaning" may be "inadequate" when it "does not resolve the

parties' dispute"); *Eon*, 815 F.3d at 1319 ("plain and ordinary meaning" may be "inadequate" when it "does not resolve the parties' dispute").

Beginning with the claim language, claim 1 of the '240 patent recites:

1.  A method for operating a ***bed device***, the method comprising:

obtaining at least one first biological signal from a first user … indicating the presence of the first user on a first zone of the ***bed device***;

obtaining at least one second biological signal from a second user … indicating a presence of the second user on a second zone of the ***bed device*** adjacent the first zone;

generating a plurality of control signals for the ***bed device*** in response to the obtained at least one first biological signal and the at least one second biological signal …; and

sending the plurality of control signals to at least one respective ***temperature control device associated with the bed device*** such that the first and second zones are heated or cooled differently according to the plurality of control signals.

The claim language shows that the "temperature control device" is a device separate from the bed device that controls the temperature of the bed device by receiving control signals and heating or cooling the bed device according to those control signals.  The temperature control device and the bed device are not the same, and construing them to mean the same thing would violate the principle of claim differentiation.  Absent any evidence to the contrary (and there is none here), the Court "must presume that the use of . . . different terms in the claims connotes different meanings."  *Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*, 373 F. Supp. 3d 1288, 1295 (N.D. Cal. 2019) (quotation omitted); *see also, e.g.*, *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000) ("Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims.").

Notably, the claim language also specifies a "temperature control device ***associated with*** the bed device."  This unequivocal language requires that the

"temperature control device" and the "bed device" are separate structures which are "associated with" each other. *See, e.g.*, *Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (finding "spring means connected to said hinged arm" required separate and distinct structures). If the temperature control device and the bed device can be the same structure, claim 1 would be nonsensical because it describes those structures as being "associated with" each other. If they are one and the same, then the temperature control device would be associated with itself. "A claim construction that renders the asserted claims facially nonsensical 'cannot be correct.'" *Becton, Dickinson*, 616 F.3d at 1255 (quoting *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)). Alternatively, to make any sense, the construction would have to effectively read "associated with" out of claim 1, rendering it surplusage, which is similarly incorrect. *See, e.g.*, *Curtiss-Wright Flow Control Corp. v. Z & J Techs. GmbH*, 563 F. Supp. 2d 1109, 1129 (C.D. Cal. 2007) ("The Federal Circuit has generally held that claim constructions which render a portion of the claim language superfluous are disfavored."); *Texas Instruments Inc. v. U.S. Int'l. Trade Commn.*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (holding that courts should not construe a patent claim term such that it renders other terms in the claim mere surplusage or reads such other terms out of the claim).

Having established that the "temperature control device" is "separate from the bed device," the remainder of Orion's proposed construction is that the temperature control device "controls the temperature of the bed device." This construction tracks the plain language of the term and the larger context of '240 patent claim 1 which shows that the temperature control device receives control signals and then heats or cools the bed device according to those signals—*i.e.*, it controls the temperature of the bed device.

The specification also describes controlling the temperature of different zones and subzones of the bed device, but never uses the phrase "temperature control device."  The specification discloses only a distinct and separate "power management box 601" depicted in Figures 6B and 6C that controls the temperature of the bed device by modulating the "power supply duty cycle" applied to the bed device's electrical coils.  '240 patent at 7:44-46.  There is no disclosure of a bed device with an integrated temperature control device, further demonstrating that the temperature control device must be construed as separate from the bed device.  *See, e.g.*, *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.,* 93 F.3d 766, 770 (Fed. Cir. 1996) (limiting term to the embodiment described in the specification where that was "not just the preferred embodiment of the invention; *it is the only one described"*).

### iii.   Claim 29 of the '240 Patent

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "A sleep system comprising a processor and a memory in operative communication with the processor and storing instructions for the processor to implement the method of claim 1" ('240 patent, claim 29, incorporating functions in '240 patent, claim 1) | Not governed by §112. | Governed by §112(f).<br><br>Defendants identify the following functions and corresponding structure for each function:<br><br>**Function**<br><br>*(Claim 1[a])*[3] Obtaining at least one first biological signal from a first user, the at least one first biological signal indicating a presence of the first user on a first zone of the bed device; |

---

[3] Because claim 29 recites "implement[ing] the method of claim 1," its functions are the functions recited in the elements of claim 1.

12                        No. 2:26-cv-02460-SB-KS

| | | |
|---|---|---|
| | | *(Claim 1[b])* Obtaining at least one second biological signal from a second user, the at least one second biological signal indicating a presence of the second user on a second zone of the bed device adjacent the first zone.<br><br>**Structure**<br><br>One or more user sensors, as illustrated in '240 patent, Figures 4, 5A, 5B, 5C, and 5D and the corresponding description at 2:55-59 and 4:64-5:49.<br><br>**Function**<br><br>*(Claim 1[c])* Generating a plurality of control signals for the bed device in response to the obtained at least one first biological signal and the at least one second biological signal, the plurality of control signals comprising (1) a first instruction to set the temperature of the first zone to a first temperature and (2) a second instruction to set the temperature of the second zone to a second temperature that is different from the first temperature, wherein the first instruction is based at least in part on a first user-specified preference of the first user and the second instruction is based at least in part on a second |

13

| | | user-specified preference of the second user. |
|---|---|---|
| | | **Structure** |
| | | A general purpose processor programmed to perform the algorithm illustrated in '240 patent, Figure 7 and the description at 7:48-8:25 and 11:56-12:21, including the following steps: |
| | | (1) In response to the obtained at least first and second biological signal, generating a first instruction to set the temperature of the first zone of the bed device to a first temperature based in part on a user-specified preference of the first user; |
| | | and |
| | | (2) In response to the obtained at least first and second biological signal, generating a second instruction to set the temperature of the second zone of the bed device to a second temperature that is different from the first temperature based in part on a user-specified preference of the second user. |
| | | **Function** |
| | | *(Claim 1[d])* Sending the plurality of control signals to at least one respective |

No. 2:26-cv-02460-SB-KS

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

| | | temperature control device associated with the bed device such that the first and second zones are heated or cooled differently according to the plurality of control signals. |
| --- | --- | --- |
| | | **Structure** |
| | | (1) a general purpose processor programmed to perform the algorithm illustrated in '240 patent, Figure 7 and the at 7:48-8:25 and 11:56-12:21, including the step of sending the plurality of control signals, *see* '240 patent at Fig. 7, 7:48-8:25; and (2) the power management box depicted in Box 601 of Figure 6B and described in the '240 patent at 7:36-47, connected to uniform coils 611 that heats or cools the first and second zone of the bed differently based on the control signals. |

Claim 29 of the '240 patent is a means-plus-function claim that must be limited by the express structures disclosed in the patent. Eight Sleep argues that claim 29 is not subject to §112(f) because it does not use "means" claiming, but it simply claims the "system" for implementing the functions in claim 1, with ***no further detail*** other than claiming a generic processor and memory with no defined features. Courts have long held that this type of claim—defined solely in functional terms—is subject to §112(f) and must therefore be confined "to ***only*** that structure corresponding to the claimed function and equivalents thereof, nothing more." *Gramm v. Deere & Co.*, 169 F.4th 1353, 1359 (Fed. Cir. 2026). In particular, the power management box that

controls the temperature of different zones of the bed using electric coils is the only possible structure that carries out the function performed by the claimed "temperature control device."

*First,* claim 29 is subject to §112(f) because its elements are purely functional. "Means-plus-function claiming allows a patentee 'to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed.'" *Gramm*, 169 F.4th at 1359 (quoting *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015)).  While claims lacking the term "means" (like claim 29 here) are presumptively not means-plus-function, courts regularly overcome that presumption where (as here) a claim term is "defined solely in functional terms, without more."  *See, e.g.*, *In re Cygnus Telecomm. Tech., LLC, Pat. Litig.*, 481 F. Supp. 2d 1029, 1049 n.12 (N.D. Cal. 2007).

Here, the presumption is overcome.  Claim 29 recites:  "A sleep system comprising a processor and a memory in operative communication with the processor and storing instructions for the processor to implement the method of claim 1."  The Federal Circuit found this way of writing a claim—reciting a system to carry out the steps of a separate method claim—to be governed by §112(f) in *In re McFadden*.  There, claim 10 (like claim 29 here) recited "a subsystem configured to use the method of claim 1 to determine an include region for a second user of the social network."  *In re McFadden*, 2025 WL 2553720, at *3 (Fed. Cir. Sept. 5, 2025).  The Court found "[t]he term "subsystem" as used in the claims is not a term of art that conveys a particular structure to a person of ordinary skill," much like the term "means."  *Id.*  The Court therefore concluded that claim 10 was properly understood as means-plus-function.  *Id.*

Here too, the term "sleep system" in claim 29 is not a term of art that conveys a particular structure.  *Id.*  The term "sleep system" provides *no information* about

16                    No. 2:26-cv-02460-SB-KS
DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

what the system comprises, other than a generic processor and memory that "implement the method of claim 1." This is not enough to take the claim outside of §112(f). *See, e.g.*, *Parity Networks, LLC ZyXEL Commc'ns, Inc. Parity Networks, LLC Moxa Inc. Parity Networks, LLC v. Edgecore USA Corp.*, 2020 WL 8569299, at *11 (C.D. Cal. Dec. 22, 2020) (finding claim was §112(f) where "each processor is defined only by the function it performs") (quoting *Syneron Med. Ltd. v. Invasix, Inc.*, 2018 WL 4696971, at *14 (C.D. Cal. Sept. 5, 2018)). In *Syneron*, the Court found "the presumption against means-plus-function claiming is rebutted" where the claim recited a "processor … configured to" perform certain steps but the claim said "nothing about how the 'processor' operates" to perform those steps. *Id.* The same is true of claim 29.

***Second,*** after determining that claim 29 is governed by §112(f), the Court must construe the means-plus-function terms using a two-step analysis. "First, the court must identify the function the means performs that is recited in the claim . . . . Second, the court must determine 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" *Gramm*, 169 F.4th at 1359 (quoting *Williamson*, 792 F.3d at 1351).

Functions: Here, the functions are simple because claim 29 expressly recites that the processor performs "the method of claim 1." Thus, the "functions" of claim 29 mirror the steps of claim 1 of the '240 patent.

Structure: To qualify as corresponding structure, the intrinsic evidence must "clearly link[] or associate[] that structure to the function recited in the claim." *Williamson*, 792 F.3d at 1352. Most importantly, "[d]istrict courts must limit the relevant limitation to ***only*** that structure corresponding to the claimed function and equivalents thereof, nothing more." *Gramm*, 169 F.4th at 1359. Where, as here, the functions are algorithms performed by software, the function is limited to the algorithm disclosed in the specification: "[t]he structure of a [computer or]

microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm." *Id.* (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999)). "This is because a general-purpose computer or microprocessor could be programmed to perform a certain task in 'very different ways.'" *Id.* (quoting *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008)). To satisfy the adequate corresponding structure requirement, computer-implemented means-plus-function terms like those here "***must have a corresponding algorithm*** disclosed in the specification." *Id.*

Claim 29 is therefore limited to the specific structure disclosed in the specification and, because it is computer-implemented, the specific algorithm disclosed. *See Williamson*, 792 F.3d at 1347 ("We require that the specification disclose an algorithm for performing the claimed function."). As set forth on an element-by-element basis in the chart above, and further detailed below, each function in independent claim 1 (which claim 29 is a system for implementing) is associated with specific structure and algorithms disclosed in the specification that define the scope of claim 29.

Claims 1[a] and [b]—claiming the function of obtaining biological signals indicating the presence of the user(s)—is limited to the use of the sensors depicted in Figures 4, 5A, 5B, 5C, and 5D and the corresponding description in the '240 patent at 2:55-59 and 6:24-57.

Claim 1[c]—"generating a plurality of control signals for the bed device in response to the obtained at least one first biological signal and the at least one second biological signal"—is limited to the general purpose processor programmed to perform the algorithms illustrated in Figure 7 and the corresponding description in the '240 patent at 2:64-65 and 7:48-8:25. That description includes only the following algorithms, to which the claim must be limited:

- "The control signal comprises an instruction to heat the bed device to the *average nightly temperature* associated with said user." '240 patent at 7:60-62; *id.* at 7:64-8:1.

- "[T]he control signal comprises an instruction to heat the bed device to a *user-specified temperature*." *Id.* at 7:62-64.

- "The control signal comprises an instruction to heat, or cool the bed to a desired temperature. The desired temperature may be automatically determined, such as by *averaging the historical nightly temperature associated with a user, or the desired temperature may be specified by the user*." *Id.* at 8:20-25.

- "The database stores the *average bed temperature corresponding to each of the sleep phase*, light sleep, deep sleep, REM sleep. If the current bed temperature is below the historical average, the process sends a control signal to increase the temperature of the bed to match the historical average." *Id.* at 12:16-21.

Claim 1[d]—"sending the plurality of control signals to at least one respective temperature control device associated with the bed device such that the first and second zones are heated or cooled differently according to the plurality of control signals"—the "temperature control device" is limited to the power management box depicted in Box 601 of Figure 6B and described in the '240 patent at 7:34-47. Specifically, "FIGS. 6B and 6C illustrate the independent control of the different subzones in each zone 610, 660, according to one embodiment. *Set of uniform coils 611, connected to power management box 601, uniformly heats or cools the bed*." '240 patent at 7:34-37. As discussed above, the only structure disclosed that controls temperature of the bed device is the power management box that supplies power to the electrical coils. *See* '240 patent at 7:38-47 (disclosing "[c]ontiguous sets of coils [that] can be heated or cooled at different levels by assigning the power supply duty

cycle to each set of coils," whereby "[t]he user can control the temperature of each subzone independently").

Where, as here, the patent only discloses one structure and one algorithm to perform the claimed functions, the patent scope is confined thereto. *See, e.g.*, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1345 (Fed. Cir. 2016) ("Therefore, we find no error in the district court's use of Enfish's own-identified three-step algorithm as the sole equivalent structure for the 'means for indexing.'"); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("Accordingly, the structure disclosed for the 'means for assigning' limitation of claim 1 of the Telnaes patent is a microprocessor programmed to perform the algorithm illustrated in Figure 6.").

### iv.   "A Processor / The Processor"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "a processor/ the processor" ('240 patent, claim 29; '339 patent, claim 29) | Plain and ordinary meaning— one or more processors. | A single processor. |

The dispute around "a processor/the processor" in claim 29 of both patents concerns whether a single processor must perform each of the claimed functions. While an indefinite article "a" or "an" in open-ended patent claims containing the transitional phrase "comprising" (as claim 29 does) typically means "one or more," *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000), it should be construed as "one" when there is a clear intent in the claims themselves or the specification to limit "a" to "one," *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016). Here, claim 29, identical in both patents, claims:

29. A sleep system comprising *a processor* and a memory in operative communication with *the processor* and storing instructions for *the processor* to implement the method of claim 1.

As discussed below, the structure of claim 29 makes plain that "a processor" and then "the processor" claimed therein is intended to refer to only one processor which is both in communication with the memory and implementing the instructions, which are stored in that memory, to implement the method of claim 1, not one or more processors.

The Federal Circuit addressed this exact issue in *Convolve*. Citing the default rule in *KCJ Corp. v. Kinetic Concepts, Inc.*, the Court held that "a processor" meant one or more processors in claims 9 and 15 of the patent at issue. *Convolve*, 812 F.3d at 1321. But, the Court reached a different conclusion with respect to claims 1, 3, and 5, finding those claims require a single processor to perform all of the claim steps despite the use of the terms "a processor" and "the processor." *Id.* There, claim 1 of the patent recited a "user interface for … working with *a processor* … comprising" a "means for controlling seek time on a data storage device, and a means for causing *the processor* to output commands to the data storage device." *Id.* (cleaned up). The Federal Circuit concluded that the claim language was clear that "the processor" referred back to the same "a processor" working with the user interface recited earlier, demonstrating "a clear intent to tie the processor that 'output[s] commands to the data storage device' to the 'user interface.'" *Id.* The Court further explained:

This reference to *"the processor," referring back to the "a processor"* recited in preamble, *supports a conclusion that the recited user interface is "operatively working with" the same processor to perform all of the recited steps.* In other words, the claim language requires a processor associated with the user interface to issue the shaped commands of the claims. Given this claim language, which contrasts with the claims described above that allow for multiple processors, we conclude that claims 1, 3, and 5 *require the user interface to work with a single processor in performing all of the claim steps*.

*Id.*; *see, e.g.*, *In re Varma*, 816 F.3d 1352, 1362-63 (Fed. Cir. 2016) ("For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks. In the present case, no matter how many requests there may be, no matter the variety of the requests the system may receive, the system must be adapted to receive a request that itself corresponds to at least two investments."); *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1317 (Fed. Cir. 2023) ("Like the claim language in *Convolve* and *Varma,* the claim language here requires a singular element—'*a* microprocessor'—to be capable of performing all of the recited functionality."); *X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1035 (N.D. Cal. 2020) ("[T]he Court finds that the first reference to an object with the indefinite article 'a' (*i.e.*, 'a map') suggests that the later references with the definite article 'the' (*i.e.* 'the map') all refer to the same map.").

Here, just as in those cases, while claim 29 of both patents does initially claim "a processor," it then claims "a memory in operative communication with ***the processor*** and storing instructions ***for the processor to implement the method of claim 1***." Thus, just as "the processor" in *Convolve* was deemed singular because it was coupled to a user interface, here the claimed "processor" is coupled to a "memory" that stores the instructions that the processor executes, and must be a single processor that performs "all of the claim steps."

Also, as in *Convolve*, a different claim recites only "a processor" without subsequently reciting "the processor." *See* '339 patent, claim 28. But while "a processor" in that claim may mean "one or more" processors—as with claims 9 and 15 in *Convolve*—claim 29 is written differently, further showing a clear intent to claim one and only one processor. *See Convolve*, 812 F.3d at 1321 ("Given this claim language, ***which contrasts with the claims described above that allow for multiple processors***, we conclude that claims 1, 3, and 5 ***require the user interface to work with a single processor*** . . . ."); *Clearstream Wastewater Sys.*, 206 F.3d at 1446 ("it

is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims").

In addition, as set forth above, claim 29 is in any event a means-plus-function claim that must be limited to the structure disclosed in the specification, which is a single processor carrying out each of the functions claimed in claim 1. *See supra* Section III.B.iii.

The lone exception is a single stray boilerplate reference toward the end of the specification mentioning "processors." '240 patent at 18:16-23. However, absent any actual disclosed embodiment describing the use of more than one processor—no one of which performs each of the claimed elements in claim 1—claim 29 must be confined to the sole disclosed embodiment of a single processor that performs each of the claimed functions. *See D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018) ("This boilerplate language at the end of the . . . specification is not sufficient to show adequate disclosure of the actual [invention]."); *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1367–68 (Fed. Cir. 2018) (finding lack of adequate written description where only general soldering was disclosed in a specification, but claims disclosed a specific means of soldering).

## IV.   CONCLUSION

For all of the reasons set forth above, Defendants respectfully submit that this Court should adopt the Defendants' proposed constructions for each of the disputed claim terms.

Dated: June 12, 2026

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: */s/  Amy H. Candido*
Amy H. Candido (CA SBN 237829)
amy.candido@stblaw.com
Jeff Nardinelli (SBN 295932)
jeff.nardinelli@stblaw.com
SIMPSON THACHER & BARTLETT LLP
One Market Plaza
Spear Tower, Suite 3800
San Francisco, CA  94105
Phone: (415) 426-7300
Fax: (415) 426-7301

Sanford L. Michelman (SBN 179702)
smichelman@mrllp.com
Aaron L. Plesset (SBN 352104)
aplesset@mrllp.com
MICHELMAN & ROBINSON, LLP
10880 Wilshire Blvd., 19th Floor
Los Angeles, CA 90024
Phone: (310) 299-5500
Fax: (310) 299-5600

Mona Z. Hanna (SBN 131439)
mhanna@mrllp.com
MICHELMAN & ROBINSON, LLP
17901 Von Karman Ave, 10th Floor
Irvine, California 92614
Phone: (714) 557-7990
Fax: (714) 557-7991

*Counsel for Defendants*
*Orion Longevity Inc. and Blue Fuzion Group Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,873 words, which complies with the 7000 word limit set by Section 6.c.i. of the Standing Order for Civil Cases Assigned to Judge Stanley Blumenfeld, Jr. updated January 6, 2026.

Dated: June 12, 2026

By: */s/  Amy H. Candido*
Amy H. Candido
(CA SBN 237829)
amy.candido@stblaw.com

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF