Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Steven Cherny (*pro hac vice*)
stevencherny@quinnemanuel.com
Patrick D. Curran (SBN 241630)
patrickcurran@quinnemanuel.com
Nicola Felice (*pro hac vice*)
nicolafelice@quinnemanuel.com
Jordan E. Alexander (SBN 305112)
jordanalexander@quinnemanuel.com
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
295 5th Avenue
New York, New York 10016-7103
Telephone:   (212) 849-7000
Facsimile:    (212) 849-7100

*Attorneys for Plaintiff,
EIGHT SLEEP INC.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| EIGHT SLEEP INC., <br><br> Plaintiff, <br><br> v. <br><br> ORION LONGEVITY INC., and BLUE FUZION GROUP LTD., <br><br> Defendants. | Case No. 2:26-CV-02460-SB-KS <br><br> **EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF** <br><br> Hon. Stanley Blumenfeld, Jr. <br> Date:  July 10, 2026 <br> Time:  8:30 a.m. <br> Courtroom:  6C |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................ 1

II.    THE '240 AND '339 PATENTS ................................................................ 1

III.   ARGUMENT ............................................................................................. 4

    A.    "bed device" ................................................................................... 4

    B.    "temperature control device" ......................................................... 7

    C.    "sleep system" .............................................................................. 11

    D.    "the processor" ............................................................................. 14

IV.   CONCLUSION ....................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alacritech, Inc. v. Microsoft Corp.*,
No. 04-03284 JSW, 2005 WL 850729 (N.D. Cal. Apr. 12, 2005) ..................... 13

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ...................................................................... 15

*Celgene Corp. v. Peter*,
931 F.3d 1342 (Fed. Cir. 2019) ................................................................. 14, 15

*Dyfan, LLC v. Target Corp.*,
28 F.4th 1360 (Fed. Cir. 2022) ............................................................ 11, 12, 13

*FS.com Inc. v. ITC*,
65 F.4th 1373 (Fed. Cir. 2023) ................................................................. 14, 15

*Gen-Probe Inc. v. Becton Dickinson & Co.*,
No. 09CV2319 BEN NLS, 2011 WL 7167137 (S.D. Cal. Nov. 22,
2011) ............................................................................................................ 15, 16

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ...................................................................... 7, 8

*In Free Motion Fitness, Inc. v. Cybex International, Inc.*,
423 F.3d 1343 (Fed. Cir. 2005) ................................................................. 14, 15

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) .......................................................................... 14

*MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) ...................................................................... 7, 10

*Oatey Co. v. IPS Corp.*,
514 F.3d 1271 (Fed. Cir. 2008) ............................................................................ 8

*Phillips v. AWH*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................................ 7

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
731 F.3d 1336 (Fed. Cir. 2013) .......................................................................... 12

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

*VDPP LLC v. Vizio, Inc.*,
No. 2021-2040, 2022 WL 885771 (Fed. Cir. Mar. 25, 2022) ...................... 12, 13

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........................................................................ 4

*Zeroclick, LLC v. Apple Inc.*,
891 F.3d 1003 (Fed. Cir. 2018) ................................................................ 11, 13

Case No. 2:26-CV-02460-SB-KS
EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

## I.      INTRODUCTION

Eight Sleep submits this opening brief in support of its constructions for the four claim terms Defendants proposed for construction. Defendants' constructions do not represent the plain meanings of the disputed terms, nor are they rooted in the intrinsic record. They are based on the litigation results Defendants seek rather than the applicable canons of claim construction. Patent claims presumptively are given their plain meanings unless the intrinsic record indicates otherwise. Here that record actually confirms that the terms should be given their plain meanings. Defendants' attempt to restrict the scope of the asserted claims should be rejected. Not only is there no evidence of lexicography or disclaimer that would allow Defendants to depart from the plain meanings of the terms at issue; there are explicit disclosures and embodiments in the patent specifications that directly *conflict* with Defendants' constructions. Defendants' constructions are not correct as a matter of law, and Defendants' invitation to legal error should be rejected.

## II.     THE '240 AND '339 PATENTS

The asserted patents are directed to systems and methods of adjusting the temperature of a bed device based on biological signals.[1] The specification[2] explains that there are various stages of sleep, with each stage characterized by differences in body temperature, heart rate, and breath rate. '240 patent at 1:39-62. Certain stages of sleep, such as the deep stages of non-rapid eye movement sleep (REM) sleep, are critical; those stages are when "the body repairs and regrows tissue, builds bone and muscle, and strengthens the immune system." *Id.* at 1:55-57. Maintaining healthy

---

[1]  Such signals include, for example, heart rate, breathing rate, temperature, motion of a user, as well as environmental properties. '240 patent at 20:38-42; '339 patent at 20:38-42.

[2]  The '240 and '339 patents share a substantively identical specification. Eight Sleep refers only to the '240 patent specification for brevity.

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

sleep is indisputably important. The asserted patents are directed to facilitating that end.

The claimed inventions promote healthy sleep and improve on the prior art by providing methods and systems of adjusting the temperature based on biological signals and user preferences. *Id.* at 2:14-37. Prior to the patented inventions, users had limited options for regulating temperature during sleep. Users could manipulate ambient temperature or modify clothing or bedding layers. As the specification explains, prior art systems intended to support healthy sleep included devices such as heating blankets that required the user to manually toggle on and off, and that provided limited functionality. *Id.* at 1:53-56. Simply put, this prior art required disturbing sleep in order to make sleep more comfortable. The two asserted patents each improved over this prior art by, for example, basing temperature adjustments and regulation on biological information, to support improved sleep.

Claim 1 of the '339 patent, for example, recites a method for operating a device associated with the bed that involves obtaining a signal that indicates that a user is present on the bed device. The claimed method turns the bed device on or off and sets the bed device to a temperature based on whether a user is present and/or the user's schedule. It also detects a second biological signal, such as heart rate or breath rate,[3] and adjusts the temperature in response to the second signal.[4] The dependent claims of the asserted patents show that the inventions can be practiced with various components and options. For example, the claimed methods may involve a bed device

---

[3]  Claim 9 of the '339 patent states that the "second biological signal" can include heart rate, breathing rate, temperature, motion of the user, or an environmental property of an environment proximate to the user. '339 patent claim 9.

[4]  Claim 1 of the '240 patent similarly recites a method for operating a bed device associated with the bed, but the method of the '240 patent involves obtaining signals from two users indicating that they are present on a first and second zone of the bed device. In response to those signals, the method heats or cools the two zones based at least in part on the preferences of each user.

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

that measures biological signals with a sensor. '339 patent claim 2. They may also involve an embodiment wherein the bed device and all of the components that make up the bed device are entirely within a mattress or mattress cover. '339 patent claim 4.[5] The bed device may also comprise a processor configured to receive biological signals and to transmit those signals to a database. '339 patent claim 28.

The claimed inventions may be implemented in a variety of ways. For example, the embodiment set forth in Figure 2 shows an example of a bed device that includes a user sensor, an environmental sensor, and a processor. This embodiment is able to detect user characteristics such as body temperature and environmental characteristics like ambient temperature, sound, or humidity. '240 patent at 5:15-35. These two sensors can communicate their readings to a processor, which may be connected to the sensors by a communication network. *Id.* at 5:40-47. The specification also discloses an embodiment illustrated in Figures 6B and 6C, which includes coils that can heat or cool the bed device. The patent explains that these coils can be controlled by an attached power management box used to control the temperature of the bed device. *Id.* at 7:34-47.

The description of Figure 7 describes a process that utilizes both the sensory embodiment and temperature control embodiment. The specification states that this process "obtains a biological signal associated with a user, such as presence in bed, motion, breathing rate, heart rate, or a temperature," as well as other such signals reflecting environmental properties "such as the amount of ambient light and the bed temperature." *Id.* at 7:48-60. The process then uses this information to heat or cool the bed device. "If the user is in bed, the bed temperature is low, and the ambient light is low, the process sends a control signal to the bed device. The control signal

---

[5]    The broader independent docent claim 1 should not be read to require the limitations recited in the dependent claims.

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

comprises an instruction to heat the bed device to the average nightly temperature associated with said user." *Id.* at 7:58-61.

At base, the patents make clear that there are numerous ways to practice the claimed inventions and that these various embodiments are consistent with the plain meanings of the words chosen to claim the inventions. As will be shown below, Defendants repeatedly depart from those default ordinary meanings in ways that contradict the express teachings and disclosures of the asserted patents.

## III.    ARGUMENT

### A.    "bed device"

| Claim Term | Eight Sleep's Construction | Defendants' Construction |
|---|---|---|
| "bed device" ('339 Patent cls. 1, 4, 28; '240 Patent, cls. 1, 8, 9, 10) | Plain and ordinary meaning | "device the user sleeps on" |

As an initial matter, Defendants' proposed construction is ambiguous. Specifically, it is unclear whether Defendants' construction refers only to a portion of the bed contacting the user, or the entire structure of the bed (*e.g.*, the frame, boxspring, headboard, *etc.*). Regardless, neither interpretation  is consistent with the intrinsic evidence, which clearly resolves the dispute in favor of adopting the plain meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term."). Although, for example, claim 1 recites a method wherein the user is detected as on the "bed device," it does not limit that claimed device to the portions upon which the user sleeps. Notably, the specification discloses several examples of "bed devices" with components other than those on which the user sleeps, including a number that are external to and physically separate from the bed, and there is no teaching in the intrinsic record limiting this term to where the user sleeps.

The disclosures in the specification make clear that Defendants' construction is wrong[6] and that the "bed device" can include components other than just the structure upon which the user sleeps. Figure 2 is instructive:



*FIG. 2*

The specification states that "FIG. 2 illustrates an example of the ***bed device*** of FIG. 1, according to one embodiment." '240 patent at 5:15-16 (emphasis added). Figure 2 includes the Mattress 200, User Sensor 210, Environment Sensor 220, and Processor 230, all of which are part of the "bed device." Processor 230 clearly is separate from the bed and not a structure upon which the user sleeps. The same is true of the Environment Sensor 220. Indeed, the specification expressly notes that "[i]n one embodiment, the environment sensors 160, 170 are placed ***next to*** the bed." *Id.* at

---

[6]  To the extent Defendants' construction refers only to a portion of the bed contacting the user, that interpretation is wrong in light of numerous disclosures. The patents demonstrate that "bed device" can also include, among other things, sensors ('339 patent claim 2; Figure 2), processors ('339 patent claim 28, Figure 2), and heating / cooling coils (layer 320 in Figure 3). None of these elements would be contacting the user and yet they are explicitly included in the description of the "bed device."

5:7-9 (emphasis added); *see also id.* at 9:64-65. Similarly, the specification's description of the Processor 230 confirms can be separate from the bed by explaining that the Processor 230 can take a variety of forms—"The processor 230 is any type of microcontroller, or any processor in a mobile terminal, fixed terminal, or portable terminal, including a mobile handset…notebook computer…tablet computer…"—none of which are reasonably understood as something on which a user sleeps. *Id.* at 6:4-15. And yet, both Figure 2 and Claim 28 (stating that "the bed device comprises a processor") make clear that the environment sensor and processor are part of the bed device. The "bed device" thus necessarily can include components separate from the bed. It simply is the user's bed as well as the equipment used to heat or cool the user's bed based on information derived from various biological signals, which can take numerous forms.

The specification's discussion of Figure 7 further supports that a bed device is not just what the user sleeps on because it specifically differentiates between  a "bed" and a "bed device." It states that "[i]f the user is in **bed**, the **bed** temperature is low, and the ambient light is low, the processor sends a control signal to the **bed device**." *Id.* at 7:58-60 (emphases added). This is just one example of the specification's repeated differentiation between something a user sleeps on (a bed) and the claimed "bed device." *See, e.g.*, *id.* at 2:27-29 ("In one embodiment, the appliance is a **bed device**, capable of heating or cooling the user's **bed**.") (emphases added).

There is nothing in the asserted claims restricting the bed device to the place where a user sleeps. The intrinsic evidence in fact shows that "bed device" must be broader than the construction suggested by Defendants—the "device the user sleeps on"—because the disclosures The Court should apply the plain and ordinary meaning of the term. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

### B.    "temperature control device"

| Claim Term | Eight Sleep's Construction | Defendants' Construction |
|---|---|---|
| "temperature control device" ('240 Patent, cl. 1) | Plain and ordinary meaning | "device separate from the bed device that controls the temperature of the bed device" |

The parties' dispute focuses on Defendants' assertion that the "temperature control device" must be "separate from the bed device." There is no language in the claims specifying that the temperature control device must be separate from the bed device and the plain meanings of either term do not suggest such a restriction. Unsurprisingly, the specification is instructive and undercuts the Defendants' attempt to rewrite the claims. *See Phillips v. AWH*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). For example, two of the disclosed embodiments show that the temperature control device is attached to the bed, which all parties agree can be part of the bed device (even if they disagree that the bed device is limited to the bed). The Court should adopt Eight Sleep's construction.

It is established Federal Circuit law that courts may depart from the plain and ordinary meaning of a claim term in only two focused circumstances: lexicography and disavowal. *Hill-Rom*, 755 F.3d at 1371. Moreover, claims should be construed so as to not exclude a preferred embodiment. "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007). "[W]here claims can reasonably be interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008).

There is no disclosure in the intrinsic record that requires the "temperature control device" to be limited to any location, much less any requiring it to be separated from the bed device. The plain meaning should thus control. *See Hill-Rom*, 755 F.3d at 1371. The intrinsic evidence, in fact, shows that Defendants' construction is wrong. For example, in one disclosed embodiment, the "temperature control device" is attached to the bed device. In Figure 6B, the "Power Management Box 601" is an example of the "temperature control device." The patent explains that a "[s]et of uniform coils 611, connected to power management box 601, uniformly heats or cools the bed." '240 patent at 7:36-37. Far from being separate from the "bed device" it is clear that the temperature control device can be and is a part or the bed device that implements the claimed functionality of the overall bed device. The "temperature control device" is not separate from the bed device.



**FIG. 6B**

Figure 6C's embodiment shows a similar configuration. There, the "Power Management Box 605," which is an embodiment of the claimed "temperature control device," is attached to coils that heat / cool different parts of the bed device. The patent explains that "power supply 605" distributes power to the coils that target different parts of the body. "Subzone 615 heats or cools the neck. Subzone 625 heats or cools the back. Subzone 635 heats or cools the legs, and subzone 645 heats or cools the feet." *Id.* at 7:40-44. These coils are also part of the bed device and are located under the surface the user sleeps on. Figure 6C is an example of another embodiment where the "temperature control device" is not separate from the bed device.

Case No. 2:26-CV-02460-SB-KS

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF



*FIG. 6C*

Figures 6A and 3 provide further support that the coils shown in Figures 6B and 6C—which are attached to the "temperature control device"—are part of the bed device. Figure 6A shows that the heating coils are placed just under the surface where the user sleeps. The specification states that "heating coil 600 is divided into two zones 660 and 610, each corresponding to one user of the bed." *Id.* at 6:58-61. And Figure 3 shows that the heating and cooling coils are one of the layers of the "Mattress 200" that is part of the bed device, as illustrated in Figure 2. The specification explains that "FIG. 3 illustrates an example of layers comprising the bed pad device of FIG. 1, according to one embodiment…Bed pad device 120 comprises a number of layers. A top layer 350 comprises fabric. A layer 340 comprises batting, and a sensor strip 330. *A layer 320 comprises coils for cooling or heating the bed device*." *Id.* at 6:16-22 (emphasis added).



FIG. 6A

FIG. 3

There is a complete lack of intrinsic evidence requiring the temperature control device to be "separate from the bed device." In fact, the intrinsic evidence often shows the opposite—that the temperature control device can be part of the bed device. The claim language demonstrates that the temperature control device can be part of the bed device, and the embodiments of Figures 6B and 6C show that the "temperature control device" can indeed be attached to—and not separate from—the bed device. Defendants' construction improperly excludes these embodiments. *See MBO*, 474 F.3d at 1333. The Court should adopt Eight Sleep's construction, which appropriately includes these embodiments.

### C. "sleep system"

| Claim Term | Eight Sleep's Construction | Defendants' Construction |
|---|---|---|
| "A sleep system comprising a processor and a memory in operative communication with the processor and storing instructions for the processor to implement the method of claim 1" ('240 Patent, Claim 29, incorporating functions in '240 Patent, Claim 1) | Not governed by § 112 | Governed by § 112(f)[7] |

The parties' dispute regarding this term focuses on whether it qualifies as a means plus function claim term under 35 U.S.C. § 112(f). Section 112(f) plainly does not apply here as the term recites no "means," but rather claims a system defined by concrete structural components—a processor and a memory in operative communication. That is an ordinary system claim, and nothing in the intrinsic record removes it from that category.

The first question in any § 112(f) analysis is whether the claim uses the word "means." This term does not. Its absence creates "a rebuttable presumption that § 112, ¶ 6 does not apply." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). To overcome that presumption, Defendants must show "by a preponderance of the evidence" that a POSA "would not have understood the claim term to connote structure in light of the claim as a whole." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365, 1367 (Fed. Cir. 2022). Defendants cannot make that showing.

In assessing structure, the court looks not to the term in isolation but to the claim as a whole. *Id.* at 1367. In *Dyfan*, the Federal Circuit reversed a district court's

---

[7] Defendants also identify proposed structures and functions. Dkt. 78 at 1-5.

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

§ 112(f) finding for a claimed "system," explaining that although "system" could be a nonce term "in a vacuum," "the claim language itself defines the 'system' to include specified structure," including structural components such as a "communication unit[s]," a "server" and "code." *Id.* at 1370–71. With respect to the "code" component of the system, the court explained that "'code,' both alone and in the context of the recited claim limitation, connotes sufficiently definite structure to a person of ordinary skill in the art." *Id.* at 1368, 1371. The same is true here. The claimed sleep system is defined by a processor, a memory in operative communication with that processor, and instructions—e.g., code—for implementing the recited method.

These components that make up the claimed system—a processor, memory, and code—are themselves structural terms that a POSA recognizes as connoting definite structure.[8] The Federal Circuit has repeatedly held as much. *See VDPP LLC v. Vizio, Inc.*, No. 2021-2040, 2022 WL 885771, at *3 (Fed. Cir. Mar. 25, 2022) (terms "processor" and "storage" connote structure to a skilled artisan, particularly where the specification explains they are "well-known"); *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013).

The specification also confirms that these terms connote structure. It states that "well-known structures and devices are shown in block diagram form," '240 patent at 3:44-46, and discloses a block diagram (Figure 19) depicting a processor with instructions and a main memory with instructions. *Id.* at Fig. 19, 15:27-38. The specification further gives concrete structural examples: a processor "may be, for example, a conventional microprocessor such as an Intel Pentium microprocessor or Motorola power PC microprocessor," *id.* at 15:64-16:3, memory "can include, by way of example but not limitation, random access memory (RAM), such as dynamic RAM

---

[8]   Indeed, Defendants appear to agree that "processor" is structural, as they propose this term for construction and do not argue that it is subject to means plus function treatment. *See* "the processor" below.

(DRAM) and static RAM (SRAM)," *id.* at 16:5-8, and the memory "is coupled to the processor by, for example, a bus," *id.* at 16:4-5. This is like the intrinsic record that defeated § 112(f) in *VDPP*, where the specification's description of "processor" and "storage" as well-known confirmed their structural character because a "skilled artisan would not understand 'processors' and 'storage' to merely be 'black box[es] for performance of a function.'" 2022 WL 885771, at *3 (citation omitted).

The same is true of the claimed "instructions for the processor to implement the method of claim 1." Courts treat such instructions as analogous to software code, which connotes sufficient structure when tied to a recited function. *See Dyfan*, 28 F.4th at 1368, 1371 ("the specific structure of software code and applications is partly defined by its function" and "'code,' both alone and in the context of the recited claim limitation, connotes sufficiently definite structure"); *Alacritech, Inc. v. Microsoft Corp.*, No. 04-03284 JSW, 2005 WL 850729, at *3 (N.D. Cal. Apr. 12, 2005) ("'a set of instructions executable on a processor' sufficiently discloses structure as software"). The instructions here are tied to implementing the method of claim 1—a defined algorithm of specific steps.

To the extent Orion contends that "sleep system" is a nonce word, that label does not meet its burden of overcoming the absence of the word "means." Even a term that might read as generic in isolation must be examined in the context of the full claim to determine whether it recites sufficient structure. Examined in context, the claimed sleep system is defined by structural components—a processor, a memory in operative communication, and instructions implementing the recited method—and is not subject to § 112(f).

### D.     "the processor"

| Claim Term | Eight Sleep's Construction | Defendants' Construction |
|---|---|---|
| "a processor"/"the processor"<br><br>('240 Patent, cl. 29; '339 Patent, cl. 29) | Plain and ordinary meaning—one or more processors. | "the processor" refers to a single processor. |

Claim 29 of both the '240 and '339 patents recites "[a] sleep system comprising *a processor* and a memory in operative communication with *the processor* and storing instructions for *the processor* to implement the method of claim 1." Because "the processor" refers back to "a processor," and because settled Federal Circuit law gives the indefinite article "a" the meaning "one or more" in a comprising claim, both terms mean "one or more processors," and thus the Court should adopt Eight Sleep's construction.

The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). The rule yields only where "the language of the claims themselves, the specification, or the prosecution history necessitate a departure," *Celgene Corp. v. Peter*, 931 F.3d 1342, 1350 (Fed. Cir. 2019), and a departure requires that "the patentee evince[d] a clear intent to limit 'a' or 'an' to 'one,'" *FS.com Inc. v. ITC*, 65 F.4th 1373, 1377 (Fed. Cir. 2023). There is no such intent here.

The dispositive point for this case is that Orion's construction turns on the later use of "the processor," but the Federal Circuit has squarely rejected the argument that a subsequent "the" confines an earlier "a" to singularity. *In Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1343 (Fed. Cir. 2005), the court "reject[ed] Cybex's argument that use of the word 'the' in connection with the word 'cable' later

14                                    Case No. 2:26-CV-02460-SB-KS

in the claim shows that the earlier reference to 'a' denotes singularity," holding that "[l]ike the words 'a' and 'an,' the word 'the' is afforded the same presumptive meaning of 'one or more' when used with the transitional phrase 'comprising.'" *Id.* at 1350-51. *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) held the same: "the use of a definite article ('said' or 'the') to refer back to an initial indefinite article does not implicate, let alone mandate the singular. Because the initial indefinite article ('a') carries either a singular or plural meaning, any later reference to that same claim element merely reflects the same potential plurality." *Id.* at 1343. District courts apply the same rule. *See Gen-Probe Inc. v. Becton Dickinson & Co.*, No. 09CV2319 BEN NLS, 2011 WL 7167137, at *5 (S.D. Cal. Nov. 22, 2011) (construing "the target nucleic acid" to mean "at least one," because that reading "results from carrying through the same general plurality from the first use of the term with 'a' to the later use of the term with 'the'"). Claim 29 presents precisely the structure these cases address: an open-ended "comprising" claim in which "a processor" is introduced and "the processor" refers back to it. Under *Free Motion* and *Baldwin*, "the processor" inherits the plurality of "a processor" and means "one or more processors."

Moreover, contrary to Defendants' construction, nothing in the claims, specification, or prosecution history evinces the requisite "clear intent" to limit "a processor" to a single processor. *FS.com*, 65 F.4th at 1377; *Celgene*, 931 F.3d at 1350. To the contrary, the specification expressly describes operation by multiple processors. For example, the specification states that "***[t]he processor*** 230 is any type of microcontroller, or any processor in a mobile terminal, fixed terminal, or portable terminal including a mobile handset…the accessories and peripherals of these devices, ***or any combination thereof***." '240 patent at 6:4-15. The phrase "any combination thereof" at the end of the list of exemplary processors means that "the processor 230" can refer to more than one of the examples listed. The specification

further discloses that multiple processors may be involved in carrying out the invention's operations:

> The computer programs typically comprise one or more instructions set at various times in various memory and storage devices in a computer, and that, when read and executed by **one or more processing units or processors** in a computer, cause the computer to perform operations to execute elements involving the various aspects of the disclosure.

*Id.* at 18:17-23 (emphasis added). These disclosures show that the inventors envisioned "the processor" to mean "one or more" and that multiple processors may work together to perform the methods claimed in the patents.

The structure of claim 1 of the '240 patent, which claim 29 incorporates, reinforces this reading. Claim 1 is not a single-user method; it requires obtaining a first biological signal from a first user on a "first zone" of the bed device, obtaining a second biological signal from a second user on an adjacent "second zone," generating a plurality of control signals that set the two zones to different temperatures, and sending those signals to "at least one respective temperature control device." The claim therefore contemplates acquisition, analysis, and independent temperature control across two users and two zones. An architecture in which one or more processors cooperate to perform these parallel operations is fully consistent with the claimed method. At a minimum, the multi-user, multi-zone structure forecloses any inference that the patentee silently intended "a processor" to mean a single processor.

Because the ordinary meaning of "a" controls, the later "the processor" carries the same plurality, and nothing in the intrinsic record overcomes the presumption, the Court should adopt Eight Sleep's proposal and construe "a processor"/"the processor" to mean "one or more processors."

## IV.    CONCLUSION

Eight Sleep respectfully requests that the Court adopt Eight Sleep's constructions.

Dated:  June 12, 2026

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**


By:   /s/ Patrick D. Curran
Alex Spiro
Steven Cherny
Patrick D. Curran
Nicola Felice

*Attorneys for Plaintiff,*
*EIGHT SLEEP INC.*

17                    Case No. 2:26-CV-02460-SB-KS

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Eight Sleep Inc., certifies that this brief contains 4,558 words, which complies with the word limit of L.R. 11-6.1.


Dated:  June 12, 2026                    **QUINN EMANUEL URQUHART &**
                                         **SULLIVAN, LLP**


                                         By:    */s/ Patrick D. Curran*
                                                Patrick D. Curran


                                         *Attorney for Plaintiff,*
                                         *EIGHT SLEEP INC.*

EIGHT SLEEP INC.'S OPENING CLAIM CONSTRUCTION BRIEF