UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


EIGHT SLEEP INC.,

     Plaintiff,

v.

ORION LONGEVITY INC. et al.,

     Defendants.

Case No. 2:26-cv-02460-SB-KS


ORDER ON CLAIM
CONSTRUCTION


     Plaintiff Eight Sleep Inc. and Defendant Orion Longevity Inc. sell competing sleep systems that use biometric measurements to adjust the temperature of a bed for optimal sleep.  Plaintiff asserts that Orion and Defendant Blue Fuzion Group Ltd., which allegedly assisted in the development and importation of Orion's system, have infringed two of Plaintiff's patents:  U.S. Patent Nos. 12,370,339 (the '339 Patent) and 12,377,240 (the '240 Patent).  The parties now raise four claim-construction disputes.   Both sides filed simultaneous opening briefs, responses, and replies.  Dkt. Nos. 83, 84, 92, 93, 103, 105.  The Court issued a tentative order, held a hearing on July 10, 2026, and now construes the disputed claims as follows.


I.


     The Court has already addressed the '339 Patent and '240 Patent in connection with Defendants' motion to dismiss, rejecting Defendants' invalidity challenge at the pleading stage.  Dkt. No. 69.  Although the patents are not attached as exhibits to the claim-construction briefing, they were filed as exhibits to the complaint.  Dkt. No. 1-1 ('339 Patent); Dkt. No. 1-2 ('240 Patent).  As the Court previously explained, both patents have identical specifications and describe "methods and systems for:  gathering human biological signals, such as heart rate, breathing rate, or temperature; analyzing the gathered human biological signals;

1

and controlling home appliances based on the analysis."  Dkt. No. 1-1 at 28; Dkt. No. 1-2 at 28.[1]  Claim 1 of the '339 Patent claims:

> A method for operating a **bed device**, the method comprising:
>
> obtaining at least one first biological signal from a user, the at least one first biological signal indicating a presence of the user on the **bed device**;
>
> determining a first control signal and a time to send the first control signal to the **bed device**, wherein the first control signal comprises a first instruction to turn the **bed device** on or off and a second instruction to set a temperature of the **bed device** to a first temperature, and wherein the time to send the first control signal to the **bed device** is based on a bedtime associated with the user, the presence of the user, or both;
>
> sending the first control signal to the **bed device** at the determined time to turn the **bed device** on or off and set the **bed device** to the first temperature;
>
> obtaining, while the **bed device** is turned on, at least one second biological signal from the user, wherein the at least one second biological signal is different from the at least one first biological signal;
>
> determining a second control signal, wherein the second control signal comprises an instruction to the **bed device** to adjust the temperature of the **bed device** to a second temperature in response to the obtained at least one second biological signal; and
>
> sending the second control signal to the **bed device** to adjust the temperature of the **bed device** to the second temperature.

Dkt. No. 1-1 at 37 (emphasis added).  The parties dispute the meaning of the term "bed device," which is also used in Claim 1 of the '240 Patent and in some dependent claims in both patents.

---

[1] The Court uses the pagination in the header (Page 28 of 38), rather than the Bates numbers assigned by the parties or the internal column pagination of the patents.

The '240 Patent applies the same technology to a bed with two separate zones, claiming in Claim 1:

A method for operating a **bed device**, the method comprising:

obtaining at least one first biological signal from a first user, the at least one first biological signal indicating a presence of the first user on a first zone of the **bed device**;

obtaining at least one second biological signal from a second user, the at least one second biological signal indicating a presence of the second user on a second zone of the **bed device** adjacent the first zone;

generating a plurality of control signals for the **bed device** in response to the obtained at least one first biological signal and the at least one second biological signal, the plurality of control signals comprising (1) a first instruction to set the temperature of the first zone to a first temperature and (2) a second instruction to set the temperature of the second zone to a second temperature that is different from the first temperature, wherein the first instruction is based at least in part on a first user-specified preference of the first user and the second instruction is based at least in part on a second user-specified preference of the second user; and

sending the plurality of control signals to at least one respective **temperature control device** associated with the **bed device** such that the first and second zones are heated or cooled differently according to the plurality of control signals.

Dkt. No. 1-2 at 37 (emphasis added).  In addition to "bed device," the parties dispute the meaning of "temperature control device" in Claim 1 of the '240 Patent.

Claim 29 of the '240 Patent claims "[a] sleep system comprising **a processor** and a memory in operative communication with **the processor** and storing instructions for **the processor** to implement the method of claim 1." *Id.* at 38 (emphasis added).  The parties raise two disputes related to this claim: (1) whether it is a "means-plus-function" claim governed by 35 U.S.C. § 112(f), and (2) whether the claim may encompass more than one "processor."  The parties' second dispute, regarding the meaning of "processor," also applies to Claim 29 of the '339 Patent, which has identical language to Claim 29 of the '240 Patent,

3

although "the method of claim 1" refers to the method in the '339 Patent.  Dkt. No. 1-1 at 38.

## II.

Claim construction is an interpretive task "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  It is "a question of law in the way that we treat document construction as a question of law," but it may require subsidiary factfinding, which is reviewed for clear error pursuant to Fed. R. Civ. P. 52(a)(6).  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325–29 (2015).  The claim language itself defines the scope of the claimed invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  But a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313.  Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis."  *Id.* at 1315 (cleaned up).

Although the specification may clarify the meaning of claim terms, limitations from the specification must not be imported into the claims.  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (en banc).  "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

Claim terms are generally given the "ordinary and customary meaning" they would have "to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312–13 (cleaned up).  But in some cases, claim terms will not be given their ordinary meaning if the specification "acts as a dictionary" by expressly or impliedly defining terms used in the claims.  *Id*. at 1321 (cleaned up).

## III.

The Court addresses each of the parties' four disputes in turn:  (1) the meaning of "bed device," (2) the meaning of "temperature control device," (3) whether Claim 29 of the '240 Patent is subject to § 112(f); and (4) the meaning of "a processor."

A.

In their briefing, Defendants maintain that, as used in the patents, "bed device" means a "device the user sleeps on."  Plaintiff contends in its briefing that the plain and ordinary meaning applies, although it does not explain what that meaning is.  Neither side produced any expert testimony or other evidence of how a person of ordinary skill in the art would interpret "bed device."  Nor has either side identified any evidence that "bed device" was a recognized term of art at the time of the invention.  Accordingly, the Court looks first to the intrinsic evidence to determine the term's ordinary meaning in the context of the patents.

The crux of Defendants' argument is that "the 'bed device' refers to the structure the user sleeps on, not off-bed hardware like external tanks, servers, or phone applications."  Dkt. No. 83 at 7–8.  But Defendants identify nothing in the language of the patents that precludes "bed device" from including components that the user does not directly sleep on.  To the contrary, the specification describes embodiments in which the illustrated "bed device" includes components beyond the mattress itself.  For example, Figure 2 of the '240 Patent, which "illustrates an example of the bed device of FIG. 1, according to one embodiment," depicts a separate processor and an environment sensor in addition to the mattress:



FIG. 2

Dkt. No. 1-2 at 7, 30.

As shown in Figure 2, the mattress, on which the user sleeps, is only one part of the illustrated bed device; the embodiment depicts additional components as part of the device.  In the absence of any contrary language in the claims themselves or any external evidence that a person of ordinary skill in the art would

5

understand the term otherwise, the embodiment in Figure 2 forecloses Defendants' attempt to limit "bed device" to the structure on which the user sleeps. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.") (collecting cases). Defendants' reliance on Plaintiff's infringement contentions to support their construction is unavailing because construction of the patent claims necessarily precedes questions of infringement. *See Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1327 (Fed. Cir. 2021) (explaining that patent infringement involves "a two-step analysis," with claim construction first, followed by "a comparison of the accused product to the construed claims"). Thus, as they conceded at the hearing, Defendants have not shown that "bed device" is limited to the structure on which a user sleeps. *See* Dkt. No. 128 at 4:18, 5:1–2 (acknowledging that their initially proposed construction was "flawed").

That Defendants' construction is wrong does not mean that no construction is needed. "A determination that a claim term . . . has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("In this case, the 'ordinary' meaning of a term does not resolve the parties' dispute, and claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit.").

Here, the parties' dispute demonstrates that reliance on the term's plain and ordinary meaning alone does not resolve the scope of "bed device." Although Plaintiff correctly observes that "bed device" differs from "bed," it does not articulate what the plain and ordinary meaning of "bed device" is or explain why that meaning resolves the parties' dispute. Plaintiff also concedes that, as Defendants argue, "bed device" does not encompass the entire "sleep system" recited in Claim 29 of both patents. *See* Dkt. No. 103 at 4 ("The claimed 'sleep system' is broader than bed device in that it includes at least a memory that stores instructions for the processor to carry out the method of claim 1."). Thus, "bed device" necessarily describes something more than the bed itself but less than the entire sleep system.[2] At the hearing, Plaintiff conceded that "bed device" requires

---

[2] In their reply, Defendants for the first time offer an alternative construction of "bed device" as "device with a portion the user sleeps on, optionally also including a processor, user sensor(s), environmental sensor(s), and electrical coils." Dkt. No. 105 at 2. Plaintiff did not have the chance to respond to this new proposal, which the Court does not consider at this time. *See Zamani v. Carnes*, 491 F.3d 990, 997

construction and that it should have proposed a definition.  Dkt. No. 128 at 12:19–21, 15:6–7.

The Court agrees with the parties that construction is necessary.  Because neither the claims nor the specifications define "bed device," and neither party offered an acceptable definition or evidence that the term had an established meaning to a person of ordinary skill in the art, the Court attempted to construe the term according to its apparent ordinary meaning in the context of the patents.  Thus, in its tentative order, the Court tentatively construed "bed device" to mean "a device configured for use with a bed."  At the hearing, Plaintiff agreed with the tentative construction, while Defendants argued that it was inadequate, contending that the parties agreed on several limitations that are not expressed in the definition.

The parties have offered little help to the Court in fashioning a construction.  At the hearing, both sides recognized that their briefing was deficient and that their arguments evolved over time.  *See* Dkt. No. 128 at 3:25–4:2 (Defendants' acknowledgement of "movement on that construction throughout the briefing process as the parties clarified their dispute between each other"); *id.* at 15:10–12 (Plaintiff's statement that "how the dispute ended up changing and what ended up being the dispute between the parties by the end of the briefing was sort of a moving target").  The burden created by the parties' shifting positions was multiplied by the fact that the parties filed three briefs apiece, rather than the single opening, opposing, and reply brief initially contemplated in the original case management order.  Dkt. No. 43.  The Court neglected to correct the plurals (e.g., "Opening Markman Briefs Due") when adopting the parties' proposed order continuing the deadlines.  Dkt. No. 70.  The parties took advantage of that oversight and filed more than 100 pages of claim construction briefing, much of which they now acknowledge was inadequate.  Nor did the parties meet and confer after receiving the Court's tentative order to discuss whether they could agree to a modified definition that would better address both sides' concerns—which Defendants acknowledged at the hearing would have been a good idea.  Thus, the Court remains largely unassisted by the parties even after reviewing the voluminous briefing.  It should go without saying that the parties' approach is inappropriate and does not serve the purpose of a *Markman* hearing (or of motion practice more generally), which is to identify the issues requiring judicial

---

(9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

resolution and present the parties' competing positions *after* they have refined and narrowed their disputes.  The Court expects better going forward.

In the absence of a showing by either side that a different definition is superior, the Court adopts its tentative definition and construes "bed device" to mean "a device configured for use with a bed."  This construction appears to reflect the ordinary meaning of the term without importing limitations from particular embodiments or from other claim limitations, while distinguishing the bed device from the broader "sleep system" recited elsewhere in the patents.  As stated at the hearing, the Court strongly encourages the parties to meet and confer further to attempt to reach agreement on an improved definition.  In the absence of agreement, the Court may refine its definition at a later stage if a more fully developed record makes clear that reconsideration is warranted.

B.

Defendants contend that the term "temperature control device" as used in Claim 1 of the '240 Patent should be construed to mean "device separate from the bed device that controls the temperature of the bed device."  Plaintiff argues that the term should be given its plain and ordinary meaning.

A temperature control device is clearly a device that controls the temperature of the bed device.  The parties dispute only whether it must be "separate from the bed device."  Because the claim describes a "temperature control device associated with the bed device," Defendants argue that "[t]his unequivocal language requires that the 'temperature control device' and the 'bed device' are separate structures which are 'associated with' each other."  Dkt. No. 83 at 10–11.  To the extent "separate" merely means "distinct," the Court agrees.  "Temperature control device" and "bed device" plainly refer to different things, and Plaintiff does not suggest otherwise.  But Defendants further argue that the temperature control device must be physically separated from the bed device, rather than integrated into a single structure.  The "associated with" claim language, however, does not support that limitation.

Two things that are associated with each other are necessarily distinct.  But it does not follow that the two associated things must be physically separate.  A house and a garage, for example, are distinct from one another but are often associated.  A garage associated with a house may be entirely detached from the house, but it also may be connected by a walkway, share a wall with the house, or even sit underneath the house's living space as part of the house.  In none of those

8

examples do the garage and the house cease to be distinct or cease to be associated with one another.  Similarly, the distinction between "temperature control device" and "bed device" is not lost merely because the temperature control device may be either physically integrated into the bed device or physically separate.  That the terms mean two different things does not prevent them from being implemented in the same structure.

Defendants rely on *Secure Web Conference Corp. v. Microsoft Corp.*, which upheld a construction finding that a security device associated with a microprocessor was a stand-alone device separate from and external to the associated microprocessor.  640 F. App'x 910, 914 (Fed. Cir. 2016).  But that conclusion rested on the patent-specific intrinsic evidence.  The court relied on the specification, which included only references to a stand-alone device and "tout[ed] the separate and stand-alone nature of the security device as an advantage."  *Id*. Here, by contrast, Defendants identify nothing similar in the specification, nor do they identify any disclaimer or lexicography requiring the temperature control device to be physically separate from the bed device.  Accordingly, *Secure Web* is inapposite.

Defendants also emphasize that in Claim 1 of the '339 Patent, signals are sent "to the bed device," whereas in Claim 1 of the '240 Patent, they are sent "to [a] temperature control device associated with the bed device."  Dkt. No. 1-1 at 37; Dkt. No. 1-2 at 37.  They argue that the contrast between the language in the two patents shows that the temperature control device "is something other than and *separate from* the 'bed device.'"  Dkt. No. 105 at 5 (emphasis in original). Defendants rely on the doctrine of claim differentiation—the presumption that different terms used in the claims of a patent have different meanings, absent evidence to the contrary.  *E.g.*, *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).  As Plaintiff noted at the hearing, Defendants' own authority explains that the Federal Circuit has "declined to apply the doctrine of claim differentiation" to independent claims within the same patent if "the claims are not otherwise identical in scope."  *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016).  Defendants do not suggest that Claim 1 of the '339 Patent and Claim 1 of the '240 Patent are identical apart from whether signals are sent to the bed device or to a temperature control device—they plainly are not.  The doctrine of claim differentiation is therefore inapposite, even assuming it applies across patents.

In any event, if the doctrine applied, it would establish only that "temperature control device" and "bed device" are not the same thing (which

Plaintiff does not dispute).  It says nothing about whether they must be physically separate.  Just as a garage remains distinct from a house whether it is attached or detached, a temperature control device may remain distinct from a bed device whether the two are physically integrated or physically separate.  Defendants therefore have not shown that the distinctness of temperature control devices and bed devices requires them to be physically separate.

In sum, Defendants have not shown that a temperature control device must be physically separate from the bed device.  Removing that unsupported limitation from Defendants' proposed definition of "temperature control device" leaves only "device that controls the temperature of the bed device."  Neither side has argued that this definition differs from the plain and ordinary meaning or that any construction is necessary given the Court's conclusion that a temperature control device need not be physically separate from the bed device.  Nor has either side produced any evidence that a person of ordinary skill in the art would understand "temperature control device" differently or that the term had a recognized meaning in the industry at the time of the invention.  Accordingly, based on the claim language and specification, Defendants have not shown any basis to depart from the term's plain and ordinary meaning.

C.

Defendants maintain that Claim 29 of the '240 Patent is a means-plus-function claim that must be limited to the express structures disclosed in the patent, while Plaintiff contends that it is not.

1.

"Means-plus-function claiming allows a patentee to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed."  *Gramm v. Deere & Co.*, 169 F.4th 1353, 1359 (Fed. Cir. 2026) (cleaned up).  Unlike an ordinary claim, a means-plus-function claim is limited to the structure(s) disclosed in the specification for performing the claimed function, and their statutory equivalents.  Means-plus-function claims are governed by § 112(f)—also referred to as § 112 ¶ 6, based on a prior version of the statute with identical language—which provides:  "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and

10

such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f).

To determine whether § 112(f) applies, courts "construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). If so, it is not a means-plus-function claim. *Id*. The presence of the word "means" is especially important; its absence creates a rebuttable presumption that the claim is not a means-plus-function claim. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). The presumption can be overcome by a preponderance of the evidence showing that the claim term fails to recite sufficiently definite structure or recites function without reciting sufficient structure for performing that function. *Id*. The "essential inquiry" is whether the claim's words are understood by persons of ordinary skill in the art to have a sufficiently definite meaning to refer to a structure. *Id*.; *Dyfan*, 28 F.4th at 1365.

2.

Claim 29 claims "[a] sleep system comprising a processor and a memory in operative communication with the processor and storing instructions for the processor to implement the method of claim 1." Dkt. No. 1-2 at 38. It is undisputed that the claim does not include the word "means," creating a presumption that it is not a means-plus-function claim. Defendants contend, however, that they have overcome the presumption. While Plaintiff points to the "processor" and "memory" as definite structures that make up the sleep system, Defendants argue that these words are too generic to provide structure. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) ("Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6.") (citation omitted).

Neither side produces any extrinsic evidence of whether a person of ordinary skill in the art would understand "processor" and "memory" to have a definite meaning. In *VDPP LLC v. Vizio, Inc.*, the Federal Circuit held that a district court erred by finding the term "processor" subject to § 112(f) where the defendant had not produced any evidence that a person of ordinary skill would not understand the limitation to recite sufficiently definite structure, as required to overcome the presumption against application of § 112(f). No. 2021-2040, 2022 WL 885771, at

11

*3 (Fed. Cir. Mar. 25, 2022) (reversing and remanding).  And in *TecSec, Inc. v. International Business Machines Corp.*, the court explained that "[t]o those skilled in the art, a system memory is a specific structure that stores data," such that the district court erred by construing the term "digital logic means" as a means-plus-function limitation where the term was "comprised of structural elements, including a system memory."  731 F.3d 1336, 1347–48 (Fed. Cir. 2013).

To be sure, the fact that the Federal Circuit has found a term to be sufficiently specific in a particular case does not mean that it always recites a definite structure.  In particular, "there is no categorical rule regarding whether the term 'processor' connotes sufficient structure to avoid interpretation in means-plus-function format.  Indeed, district courts have found some uses of 'processor' connote sufficient structure while others do not."  *WSOU Invs. LLC v. Google LLC*, No. 2022-1063, 2023 WL 6889033, at *3 (Fed. Cir. Oct. 19, 2023).  But at a minimum, "the term 'processor' is not a nonce word and, in some circumstances, the term would connote sufficient structure."  *Id*.[3]  In *WSOU*, the Federal Circuit affirmed a district court's application of § 112(f) where "the specification treats the word 'processor' so broadly as to generically be any structure that manipulates data."  *Id*. at *4.

Defendants fault Plaintiff for producing no expert testimony as to the meaning of the claim terms, Dkt. No. 93 at 14, but it is Defendants who bear the burden to overcome the presumption that § 112(f) does not apply by a preponderance of the evidence, and they have produced none.  Having elected to rely almost exclusively on attorney argument, Defendants offer no expert testimony or other evidence that a person of ordinary skill in the art would understand either "processor" or "memory" to lack sufficiently definite structure.  Moreover, the specification states that "well-known structures and devices are shown in block diagram form" and discloses a block diagram in Figure 19 depicting a processor with instructions and a main memory with instructions.  Dkt. No. 1-2 at 27, 29.  Rather than describing the processor and memory solely by their

---

[3] *In re McFadden*, on which Defendants rely, held that the term "subsystem" was "not a term of art that conveys a particular structure to a person of ordinary skill" and was therefore a nonce word similar to "means" and subject to § 112(f).  No. 2024-2107, 2025 WL 2553720, at *3 (Fed. Cir. Sept. 5, 2025).  Claim 29 does not use the term "subsystem," and Defendants have not shown that "processor"— which the Federal Circuit has concluded is not a nonce word even when it does not convey the requisite structure—is analogous to "subsystem."  *McFadden* is therefore inapposite.

functions, the specification identifies them as concrete components of the disclosed
sleep system.  It also gives concrete examples, stating that "[t]he processor may be,
for example, a conventional microprocessor such as an Intel Pentium
microprocessor or Motorola power PC microprocessor" and that "memory can
include, by way of example but not limitation, random access memory (RAM),
such as dynamic RAM (DRAM) and static RAM (SRAM)" and "can be local,
remote, or distributed."  *Id*. at 35.  These disclosures reinforce, rather than
undermine, the conclusion that the claim recites identifiable structural components.

On this record, particularly in the absence of evidence about how a person of
ordinary skill in the art would understand the terms "processor" and "memory,"
Defendants have not met their burden to show that Claim 29 of the '240 Patent is a
means-plus-function claim subject to § 112(f).  Defendants therefore have not
overcome the presumption against applying § 112(f).

D.

Finally, the parties dispute whether Claim 29, which recites a sleep system
"comprising a processor and a memory in operative communication with the
processor and storing instructions for the processor to implement the method of
claim 1," requires a single processor because of its repeated references to "the
processor," as Defendants contend, or one or more processors, as Plaintiff
contends.

The Federal Circuit "has repeatedly emphasized that an indefinite article 'a'
or 'an' in patent parlance carries the meaning of 'one or more' in open-ended
claims containing the transitional phrase 'comprising,'" like Claim 29.  *KCJ Corp.
v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (collecting cases).
"Unless the claim is specific as to the number of elements, the article 'a' receives a
singular interpretation only in rare circumstances when the patentee evinces a clear
intent to so limit the article."  *Id*.  Using the word "the" to refer to the item later in
the claim does not denote singularity:  "Like the words 'a' and 'an,' the word 'the'
is afforded the same presumptive meaning of 'one or more' when used with the
transitional phrase 'comprising.'"  *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
423 F.3d 1343, 1350–51 (Fed. Cir. 2005); *accord Baldwin Graphic Sys., Inc. v.
Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) ("The subsequent use of
definite articles 'the' or 'said' in a claim to refer back to the same claim term does
not change the general plural rule, but simply reinvokes that non-singular meaning.
An exception to the general rule that 'a' or 'an' means more than one only arises

13

where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.").

Defendants rely principally on *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313 (Fed. Cir. 2016). There, the Federal Circuit reiterated that the exceptions to the general rule are "extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *Id*. at 1321 (cleaned up). The court applied that rule to two claims reciting an apparatus comprising "a processor" that executes certain process steps, finding no evidence clearly limiting "a processor" to a singular processor. *Id*. However, as to three claims describing a "[u]ser interface for . . . working with a processor . . . comprising" certain means, the court found that the language and structure, which "recite[d] 'a processor' in the preamble before recitation of 'comprising,'" demonstrated a clear intent to "require the user interface to work with a single processor in performing all of the claim steps." *Id*.

Rather than supporting their argument, *Convolve* reinforces that Defendants have not overcome the general rule. Here, the references to "a processor" and "the processor" in Claim 29 all appear after "comprising"—it is the sleep system, not the processor, that comprises what follows. Thus, Claim 29 is structured like the claims the *Convolve* court found subject to the general rule, and unlike the claims in which it found the requisite clear intent to require a single processor because "processor" was part of the preamble that preceded "comprising." Nor do Defendants identify anything in the claim language, specification, or prosecution history evincing the clear intent necessary to depart from the ordinary rule.

Accordingly, Defendants have not shown that this is one of the "extremely limited" instances in which "a" and "the" should be construed to require a single processor. Consistent with the well-established rule, the Court construes Claim 29 in both patents as requiring one or more processors.

IV.

In sum, the Court finds on this limited record that: (1) "bed device" means "a device configured for use with a bed"; (2) "temperature control device" carries its plain and ordinary meaning and need not be physically separate from the bed device; (3) Claim 29 of the '240 Patent is not a means-plus-function claim subject

to § 112(f); and (4) Claim 29 of both patents does not require a single processor but instead encompasses one or more processors.


Date: July 17, 2026

_____
Stanley Blumenfeld, Jr.
United States District Judge